recommended a life sentence had Williams's counsel properly investigated his background, prepared his witnesses, and provided the jury a more detailed look into Williams's background.

### III.  CONCLUSION

I believe that the Ohio Court of Appeals unreasonably applied clearly established Supreme Court precedent when it held that Williams had not satisfied either the performance or the prejudice prongs of the two-part *Strickland* test.  In my opinion, Williams satisfied these two prongs by demonstrating that his attorneys neglected to conduct a proper investigation into his background, failed to inform mitigation witnesses of the purpose of presenting mitigating evidence during the sentencing phase and to prepare such witnesses for their testimony, and gave a counterproductive presentation of mitigation theories at trial.  Therefore, I would reverse the district court's decision to deny habeas corpus relief and would issue a writ of habeas corpus on the ground that Williams was denied effective assistance of counsel at the sentencing phase of his trial.  I respectfully dissent.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0269P (6th Cir.)
File Name:  01a0269p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

LEWIS WILLIAMS, JR.,
    *Petitioner-Appellant,*

    v.                                          No. 98-3793

RALPH COYLE, Warden,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 96-00793—John M. Manos, District Judge.

Argued:  September 14, 2000

Decided and Filed:  August 16, 2001

Before:  KENNEDY, SUHRHEINRICH, and MOORE,
Circuit Judges.

—————————

### COUNSEL

**ARGUED:**    John B. Gibbons, Cleveland, Ohio, for Appellant.    Michael L. Collyer, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Cleveland, Ohio, for Appellee.  **ON BRIEF:** Paul R. Donohue, LAW OFFICES OF PAUL C. DONOHUE, Westlake, Ohio, for Appellant. Michael L. Collyer, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Cleveland, Ohio, for Appellee.

KENNEDY, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined.  MOORE, J. (pp. 37-60), delivered a separate dissenting opinion.

---

**OPINION**

---

KENNEDY, Circuit Judge.  Petitioner, Lewis Williams, Jr., was indicted and convicted of first degree murder, and sentenced to death.  After unsuccessful direct appeals and several state post-conviction proceedings, Williams filed this petition for a writ of habeas corpus.  After ruling that the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) (AEDPA), governed Williams's petition, the district court entered judgment dismissing the petition.  The district court issued a certificate of appealability only on the question of whether Williams's petition was governed by the AEDPA. On Williams's appeal, we held that it was.  *See Williams v. Coyle*, 167 F.3d 1036 (6th Cir. 1999).  On his appeal of the denial of a certificate on the other issues he had raised in his petition, we issued a certificate of appealability on four issues.  Those are, whether the district court erred by (1) denying Williams's request for an evidentiary hearing, (2) finding that the Ohio court's ruling on Williams's ineffective assistance of counsel at the sentencing stage claim was not contrary to or an unreasonable application of the law, (3) finding that the Ohio court's ruling on Williams's *Brady* violation claim as it related to the testimony of Anderson and Brooks was not contrary to or an unreasonable application of the law, and (4) finding that the Ohio court's ruling on Williams's Eighth Amendment claim-- that the trial court incorrectly instructed the jury on the Ohio's death penalty statute--was not contrary to or an unreasonable application of the law.  In response to the Eight Amendment and *Brady* claims, the Warden, acting on behalf of the State, argues that Williams procedurally defaulted these by failing to raise them at the earliest opportunity.  And, moreover, on the whole, Williams's claims, including the ones the Warden claims Williams defaulted, are without merit.

that Terry Williams had not been prejudiced by such performance was an unreasonable application of clearly established Supreme Court precedent.  After noting several accounts of the undiscovered mitigation evidence, Justice O'Connor asserted that "[t]he consequence of counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances manifested itself during his generic, unapologetic closing argument, which provided the jury with no reasons to spare petitioner's life."  *Id.* at 415.  Justice O'Connor then explained that the Virginia Supreme Court's decision involved an unreasonable application of clearly established law because it "reveal[ed] an obvious failure to consider the totality of the omitted mitigation evidence."  *Id.* at 416.

In this case, the Ohio Court of Appeals displayed its failure to consider the totality of the mitigating evidence.  Had Lewis Williams's attorneys conducted a proper investigation, they would have uncovered mitigating evidence that is quite similar to that noted in *Williams v. Taylor*, including molestation at five or six years old; Williams's witnessing the serious, physical abuse of his mother by his stepfather; the use of cocaine as early as thirteen years old; the regular sale of marijuana by Williams's father; frequent beatings of Williams with objects such as extension cords; Williams's failure to complete schooling higher than the ninth grade; and Williams's low IQ.[7]  Like the six-justice majority in *Williams v. Taylor*, I believe that a description of Lewis Williams's childhood, filled with sexual abuse and drug use and exposure to drugs at a young age, and parental neglect might well have influenced the jury's appraisal of Williams's moral culpability.  In sum, I would hold that Williams was prejudiced by his counsel's deficient performance during the sentencing phase and that it was objectively unreasonable for the Ohio Court of Appeals to conclude under *Strickland* that there was no reasonable probability that the jury would have

---

[7] Only the district court was aware of Williams's low IQ.

prejudice resulting therefrom was both contrary to and an unreasonable application of its precedent.

In *Williams v. Taylor*, Justice Stevens, writing for six Justices in Part IV of his opinion, held that the defendant Terry Williams had been prejudiced by his counsel's failure to investigate and uncover "extensive records graphically describing [Terry] Williams' nightmarish childhood," including the facts that "that [Terry] Williams was 'borderline mentally retarded' and did not advance beyond the sixth grade;" that "[Terry] Williams' parents had been imprisoned for the criminal neglect of [Terry] Williams and his siblings, that [Terry] Williams had been severely beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody"; that Terry Williams was commended for helping to crack a prison drug ring and for returning a guard's missing wallet; and that Terry Williams was considered by prison officials as the inmate "'least likely to act in a violent, dangerous or provocative way.'" *Williams*, 529 U.S. at 395-96 (citation omitted). Justice Stevens further wrote that such failure to investigate was not because of any strategic calculation and that the state supreme court unreasonably applied clearly established Supreme Court precedent to the facts of the case by failing to "evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — in reweighing it against the evidence in aggravation." *Id.* at 397-98. Finally, Justice Stevens concluded that "the graphic description of [Terry] Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id.* at 398. Likewise, Justice O'Connor, who concurred on the *Strickland* analysis just described and who was also joined by Justice Kennedy in Part III of her opinion, also concluded that counsel for Terry Williams was constitutionally ineffective on similar grounds and that state supreme court's determination

We agree that the district court's judgment should be affirmed. In spite of the Warden's assertions, however, we reach the merits of Williams's Eighth Amendment and *Brady* claims because it is unclear whether Williams procedurally defaulted them. On the issue of the evidentiary hearing, we believe Williams was in fact provided a federal evidentiary hearing, and is actually requesting a second federal evidentiary hearing. He has offered no argument to persuade us that he is entitled to a second such hearing. We reject Williams's Eighth Amendment jury instruction claim because Ohio's Supreme Court had ruled that the trial court's instruction was a correct interpretation of Ohio's death penalty statute. Likewise, we find the ineffective assistance of counsel claim without merit because Williams failed to establish that it was unreasonable for the state courts to find his trial counsel's failure to investigate and present further mitigating evidence was below the professional standards of the time. Finally, on the *Brady* claim, although the district court should not have applied the AEDPA's standards to that claim, it was correct to dismiss the claim as Williams failed to prove the existence of any exculpatory evidence or that the alleged evidence was material.

A general description of the factual and procedural background precedes our analysis, which will include additional background as necessary.

### I. Facts

On February 1, 1983, a Cuyahoga County Grand Jury indicted Williams for robbery, theft, aggravated robbery, aggravated burglary, and aggravated murder with specifications in connection with the robbery and murder of Leona Chmielewski.[1] *See* Joint Appendix (J.A.) at 465-70. Williams pleaded not guilty and proceeded to trial where he was represented by Floyd Oliver and Arthur Lambros.

---

[1] The state chose not to prosecute Williams on the aggravated burglary and theft counts.

At trial, the prosecution called as witnesses several of Williams's friends and relatives who were with him on the night of the murder. They testified they saw Williams standing in the doorway of Chmielewski's house as they were leaving the neighborhood. When they returned, about an hour later, they noticed that Chmielewski's door was open. Upon investigating, they discovered her body on the floor inside the doorway. At that point, they called the police. The police discovered that Chmielewski had been beaten around the head and neck and shot through the mouth. Additionally, her purse had been overturned and her wallet was missing. The police arrested Williams.

The prosecution also introduced evidence that (1) a partial shoe print on the nightgown Chmielewski was wearing at the time of her murder matched the print from the shoes Williams was wearing at the time of his arrest and (2) the jacket Williams was wearing at the time of his arrest contained a trace of lead powder, similar to that discharged from a gun. And, over Williams's objections, the prosecution called Michael Anderson and Brooks Navarro, two jail-house informants, to testify. They testified that, while in jail, Williams admitted to them he killed Chmielewski. According to Anderson, Williams told Anderson that he "stuck the gun in her mouth." Brooks testified that Williams told Brooks he was worried about the blood on his shoes. Williams attorneys cross-examined Anderson and Brooks, inquiring whether they currently had a deal with prosecution to exchange testimony for more lenient sentences or hoped the State would later consider leniency on account of their testimony. Each answered that while he did not have a deal with the prosecution, he did hope the state would remember his cooperation. Likewise, the prosecutor stated that he would likely take Anderson's and Brooks's cooperation into account. On October 7, 1983, the jury found Williams guilty of aggravated murder and aggravated robbery, thereby making him eligible for the death penalty. The trial then proceeded to the sentencing stage.

when he failed to acknowledge his absence from Williams's life and how such absence contributed to Williams's troubled childhood and life of crime. Lewis Sr. stated that "whenever [Williams] called [him] or anything, [he] was there." J.A. at 2099. He also claimed, "Well as his father, I spent as much time as I possibly could, as I said. When he was away or wasn't home, I would go over to visit him and keep a close contact with him as much as I possibly could, when it was possible." J.A. at 2101. Additionally, without the mitigating factual support to show why Williams was led to a life of crime or how the criminal justice system had failed Williams, the attorneys' presentation of Williams's criminal track record as a juvenile and an adult was similarly damaging, as it suggested that Williams was incapable of rehabilitation.

It was an objectively unreasonable conclusion to hold that the presentation of such theories of mitigation by defense counsel without any adequate investigation into, preparation of, and development of the factual foundation for the theories constituted effective assistance of counsel. As the Supreme Court noted in *Strickland*, "[t]hat a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command." *Strickland*, 466 U.S. at 685. The lawyer must assist the defendant in his trial and be an advocate for his cause. *Id.* at 688.

In essence, in this case where counsel neglected to perform an adequate investigation of Williams's background to identify mitigating evidence and prepare witnesses, and, as a result, essentially presented no mitigating evidence to the jury for Williams, it was an unreasonable application of the law established in *Strickland* to hold that there was no reasonable probability that the jury would have arrived at a different outcome had counsel's performance not been deficient. In fact, I believe that this case is strikingly similar to *Williams v. Taylor*, in which the Supreme Court concluded that the Virginia Supreme Court's decision regarding defense counsel's performance during the sentencing phase and the

deficient that it undermined confidence in the jury's recommendation of the death penalty.

As I previously noted, a jury must be permitted to consider mitigating evidence proffered by a defendant during the sentencing phase of a capital trial, and defense counsel must meet minimal standards of investigation to obtain such evidence for the jury. *Lockett*, 438 U.S. at 604; *Kimmelman*, 477 U.S. at 384 (relying on *Strickland*). In this case, Williams's attorneys failed to meet these minimal standards of investigation by unnecessarily limiting their investigation to two family members, one family friend, and one report from the court clinic. As I explained above, this, in effect, deprived Williams of the opportunity to present any valuable mitigating evidence, all of which was easily accessible, to the jury during the sentencing phase and left nothing for the jury to weigh against the prosecution's proof of aggravating factors. Given the wealth of information that the attorneys could have presented regarding Williams's troubled life, *see supra*, and the ease with which the attorneys could have obtained such information, it is difficult to imagine how the attorneys' failure to conduct a proper investigation and then present meaningful mitigating evidence did not prejudice Williams. After all, the very reason for allowing a capital defendant to present mitigating evidence to a jury is so that the jury may consider and weigh these factors against the aggravating circumstances of the defendant's offense to determine whether the defendant's life should be spared. In this case, although defense counsel had two theories of mitigation, they failed to provide readily available factual support for both of their theories and, as a result, essentially left the jury with no choice but to recommend the death penalty.

Not only did Williams's attorneys fail to present any meaningful mitigating evidence at the sentencing phase, they also placed harmful and damaging evidence before the jury. For example, because the attorneys failed to explain the purpose of mitigating evidence to Williams's father, Lewis Sr. gave damaging testimony during the sentencing hearing

At the sentencing hearing, Williams's counsel introduced mitigating evidence in the form of testimony from three witnesses--his father, his sister, and a family friend--and an unsworn oral statement from Williams. Williams's father and sister testified that Williams had a troubled childhood. The friend of the family also spoke of several events in Williams's childhood that indicated he was raised in a hostile environment. Williams made statements to a similar effect and also stated that he had been involved with the law on several occasions. Apparently counsel's strategy in introducing this evidence was to demonstrate to the jury that because of his upbringing, Williams did not have "much of a chance" in life. A fact which counsel apparently hoped would engender feelings of mercy from the jury. According to the district court, counsel was also attempting to show that the legal system had failed Williams.

At the close of the proceeding, the judge instructed the jury that under Ohio's Revised Code sections 2929.03 and .04, it could return one of three sentence recommendations--death or one of two life sentences--based upon whether it found that the aggravating circumstances outweighed the mitigating circumstances. Any of these recommendations, the judge instructed, must be based on a unanimous decision. *See* J.A. at 2143-44. Williams's counsel did not object to the instruction. After deliberating, the jury recommended a sentence of death, which the court accepted. On November 10, 1983, the court entered its judgment that Williams was sentenced to death. *See* J.A. at 471.

Williams, represented by Oliver, appealed the judgment and sentence. On October 25, 1984, an Ohio Court of Appeals affirmed the conviction and sentence. *See State v. Williams*, No. 47853, 1984 WL 5289 (Ohio Ct. App. Oct. 25, 1984) (unpublished journal entry and opinion). Williams then appealed to the Ohio Supreme Court where he was represented by Marilyn Damelio and Richard Gideon. Finding no merit, the Ohio Supreme Court affirmed his conviction and sentence on March 26, 1986. *See State v. Williams*, 490 N.E.2d 906 (Ohio 1986). Williams then

applied for a writ of certiorari to the United States Supreme Court. The Court denied the application. *See Williams v. Ohio*, 480 U.S. 923 (1987).

Having exhausted his direct appeals, Williams turned his attention to state post-conviction proceedings for relief. In all, Williams filed five state post-conviction relief (PCR) petitions and took appeals from four of the five dismissals. Additionally, Williams filed an application for delayed reconsideration of his ineffective assistance of counsel claim in his case--as is required under Ohio's *Murnahan* rule. *See State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992).

Proceeding *pro se*, Williams filed his first petition for PCR on April 4, 1986. There, he alleged ineffective assistance of counsel and what he now argues was a *Brady* violation. The trial court dismissed without opinion and Williams did not appeal. He filed a second PCR, related to the robbery, which was also dismissed. Again, Williams did not appeal.

Instead, represented by Robert Ingersoll, he filed his third petition for PCR on November 20, 1987.[2] In it he alleged, among other things, that he was deprived of effective counsel at the guilt and sentencing phases of his trial as well as on appeal. He did not allege a *Brady* violation. Again the trial court dismissed. The Ohio Court of Appeals affirmed on July 1, 1991, *see State v. Williams*, 600 N.E.2d 298 (Ohio Ct. App. 1991), and the Ohio Supreme Court dismissed the appeal on November 20, 1991, finding that "no substantial constitutional question" was presented. *State v. Williams* 580 N.E.2d 784 (Ohio 1991) (unpublished table decision).

On August 31, 1990, while his third petition was still on appeal, Williams filed his fourth petition for PCR. In it he alleged, among other things, that he received ineffective assistance of counsel and suffered a *Brady* violation. The trial court dismissed the *Brady* claim as procedurally barred by the

---

[2]Williams's second PCR proceeding does not concern his murder conviction.

and (2) that the criminal justice system had let Williams down by not rehabilitating him. After all, their first theory was meaningless without an actual presentation of the very troubled childhood that led Williams to a life a crime, a childhood that the attorneys failed to support factually because they neglected to interview Williams's family members and to obtain his school and psychological records. Likewise, their second theory was meaningless without an investigation and review of Williams's juvenile and prison records, which would have revealed more information about Williams's incarceration in state facilities, including details concerning any failed attempts of rehabilitation. In essence, without presenting evidence of a troubled childhood and information on the actual failures of the state criminal justice system, the attorneys' questioning of Williams and presentation of mitigating evidence, which revealed Williams's long history of juvenile and then adult crimes, and counsel's closing argument (spanning no more than three and a half transcript pages), in which counsel reiterated this long history, tended only to support a death sentence recommendation, as they did nothing to shift moral culpability away from Williams. In fact, the district court suggested as much when it stated "that the defense presented little *(if any) relevant mitigating* evidence to the jury at the hearing." J.A. at 185 (emphasis added). In conclusion, because of his attorneys' failure to prepare witnesses and to gather necessary background information to support their mitigation theories, I would also hold that Williams has sufficiently shown that his attorneys' deficient presentation of evidence during the sentencing phase of his trial satisfies the performance prong of the *Strickland* test.

## C. Prejudice

Finally, I believe that the Ohio Court of Appeals unreasonably applied the legal standards of *Strickland* when it determined that Williams failed to show that he was prejudiced by his counsel's performance during the sentencing phase. In my opinion, the performance of Williams's attorneys during the sentencing phase was so

The body of counsel's presentation of the witnesses' testimony during the sentencing hearing was equally deplorable and reflected little preparation. For example, defense counsel's failure to prepare Deborah Williams for her testimony and to explain the purpose of mitigating evidence to her significantly hurt Williams because it resulted in Deborah's omission of valuable mitigating evidence (that she included in her post-conviction affidavit) from her testimony, including information concerning Lewis Williams, Sr.'s absence from and lack of involvement in the lives of his children, *see* J.A. at 1063-64 (Deborah Williams Aff.); Williams's witnessing the abuse of his mother by his stepfather, including one instance that resulted in his mother's hospitalization, *see* J.A. at 1064 (Deborah Williams Aff.); Lewis Williams, Sr.'s use of marijuana, *see* J.A. at 1065 (Deborah Williams Aff.); and Williams's early use of cocaine at age 13, *see* J.A. at 1065 (Deborah Williams Aff.). Likewise, the prosecution's cross-examination of Ms. Packnett revealed that defense counsel had no knowledge of Ms. Packnett's familiarity with Williams. As the prosecution's cross-examination revealed, Ms. Packnett hardly knew any facts regarding Williams's life after his childhood and was completely unaware of Williams's criminal history. Ms. Packnett's lack of familiarity with Williams effectively erased any positive effect of her testimony. For while the jury could clearly see that Ms. Packnett had good intentions in testifying on behalf of Williams, the jury likely discredited her testimony that Williams was an "excellent fellow" because of her complete lack of knowledge regarding Williams's criminal history. In essence, the jury likely felt that Ms. Packnett's supportive testimony for Williams was completely negated by the fact that she was not even familiar enough with Williams to know that he had spent time in jail.

More importantly, I believe that, as a result of the attorneys' failure to investigate Williams's background properly, they failed to present meaningful evidence to support their two theories of mitigation during the sentencing phase: (1) that Williams's troubled childhood had led him to a life of crime;

doctrine of res judicata and rejected the ineffective assistance of counsel claims on the merits. That ruling was affirmed by the Ohio Court of Appeals on April 1, 1993, *see State v. Williams*, No. 62066, 1993 WL 95548 (Ohio Ct. App. April 1, 1993), and the Ohio Supreme Court dismissed on September 29, 1993, without opinion, *see State v. Williams*, 619 N.E.2d 698 (Ohio 1993) (unpublished opinion).

Undeterred by his lack of success, Williams filed a fifth petition for PCR on July 8, 1992. Again he asserted that his counsel were ineffective and that the prosecution violated his due process rights by failing to disclose exculpatory evidence. And again the trial court dismissed on the grounds of res judicata and the Court of Appeals affirmed, *see State v. Williams*, No. 68613, 1996 WL 17333 (Ohio Ct. App. Jan. 18, 1996) (unpublished opinion), and the Ohio Supreme Court dismissed without opinion, *see State v. Williams*, 663 N.E.2d 330 (Ohio 1996) (unpublished table opinion).

On June 30, 1993, while litigating his fifth PCR, Williams filed an Application for Delayed Reconsideration in the court of appeals on his ineffective assistance of appellate counsel claim, as is required by Ohio law. The court dismissed the application because Williams filed it in the wrong case. On October 27, 1994, Williams filed the application again, this time in the correct case. The court dismissed the application under Ohio Appellate Rule 26(B) because Williams failed to show good cause to reopen his case. Williams appealed that dismissal to the Ohio Supreme Court, which, on February 7, 1996, affirmed the court of appeals on the ground that Williams failed to demonstrate good cause for his untimely filing.

Coming to the realization that he was not going to obtain any state post-conviction relief, Williams filed a notice of intent to file a Petition for a Writ of Habeas Corpus on April 19, 1996. Then on November 1, 1996, Williams filed a Petition for a Writ of Habeas Corpus, challenging his conviction and sentence. Williams's petition raised thirty-two grounds for relief, including claims of (1) ineffective

assistance of counsel at the trial and appellate phases of his case, (2) a *Brady* violation, and (3) a violation of his Eighth Amendment rights as a result of the trial judge's jury instruction regarding Ohio's death penalty statute, Ohio's Revised Code section 2929.04. In addition, Williams requested an evidentiary hearing to present new evidence on the *Brady* and ineffective assistance of counsel claims. The Warden responded, arguing in part that Williams had procedurally defaulted his *Brady* and Eighth Amendment claims.

The district court granted Williams's request for an evidentiary hearing. At the hearing, Williams introduced the testimony of a ballistics expert and a mitigation expert to support the ineffective assistance of counsel at the guilt and sentencing stages of his trial claim, and to support his *Brady* claim, an affidavit from Anderson stating that he testified against Williams as part of a deal with the prosecution. He did not call either Anderson or Brooks to testify. Williams also subpoenaed his former counsel but did not take former counsel's deposition or call him to testify. In response, the State called the prosecutors who tried Williams's case. Both denied making a deal with either Anderson or Brooks. After conducting the hearing, the district court found that although Williams filed his notice of intent to file a petition for habeas corpus before the effective date of the AEDPA, it nevertheless governed his case because he filed his petition after that date. And because Williams had failed to develop the record and could not make the showing required under section 2254(e) to obtain an evidentiary hearing, the district court concluded, it would rule on the petition without reliance on the evidence presented at the hearing. Nevertheless, it did consider the evidence in its ruling.

In ruling on the petition, the district court declined to address whether Williams procedurally defaulted on his *Brady* and Eighth Amendment claims and instead based its decision on the merits of those claims. It found both claims wanting merit, with or without the evidence presented at the evidentiary hearing. It also found that Williams's ineffective

application of clearly established Supreme Court precedent in *Strickland* where "[t]he record establishe[d] that counsel did not begin to prepare for [the sentencing] phase of the proceeding until a week before the trial" and "failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records").

## B. Presentation Of Evidence During Sentencing Phase

I also believe that Williams has sufficiently demonstrated that his attorneys' presentation of evidence during the sentencing phase was inadequate under the performance prong of the *Strickland* test. Specifically, I believe that, as a result of their poor investigation and preparation of mitigating evidence, Williams's attorneys gave an objectively unreasonable presentation of the mitigating evidence during the sentencing phase of Williams's trial.[6]

To begin, the opening statement of Williams's counsel was *at best* neutral, consisting in its entirety only of the following three sentences, in which counsel stated:

> Ladies and gentlemen, there will be a number of witnesses who will be before you to give some testimony with reference to the background of Lewis Williams, Jr. I will ask you to listen to their testimony carefully. It is our view that it is extremely important that you do and that you weigh it as you do other evidence and follow the instruction that the Court will give you about Lewis Williams, Jr. Thank you.

J.A. at 2080. Inexplicably, counsel did not even begin the sentencing hearing with a request for mercy on Williams.

---

[6] Even the district court conceded that "the defense at Williams's mitigation hearing was sparse and of questionable value." J.A. at 174.

Center at the age of 11.[5] More importantly, the attorneys may have obtained the very records needed to give a meaningful presentation of one of their mitigation theories (as identified by the district court), that the juvenile justice system had failed Williams. Such records would have detailed exactly how the system had failed Williams, including its failure to meet his psychological and emotional needs. *See* J.A. at 672-81 (Schmidt-Goessling Aff.) (providing an explanation for why juvenile facilities reinforced Williams's criminal behavior, rather than rehabilitated him).

In sum, had the attorneys met the minimal standards of investigation necessary to obtain relevant mitigating information, *see Kimmelman*, 477 U.S. at 384, they could have presented relevant mitigating information to the jury. The attorneys failed, however, to perform an adequate investigation and instead unreasonably limited the number of persons they interviewed and neglected to prepare even those persons for their testimony at the sentencing hearing. Therefore, I would hold that Williams has sufficiently demonstrated that his attorneys' inadequate investigation and preparation of mitigation evidence constituted deficient performance under the first prong of the *Strickland* test. *See, e.g., Williams*, 529 U.S. at 395 (concluding that the state supreme court's decision was contrary to and an unreasonable

---

[5] As I previously indicated, Williams's school records also revealed that Williams scored a 76 on an IQ test at age 11 and that Williams was on the borderline level of human intelligence, operating at approximately the sixth lowest measurable percentile. *See* Dep. of Dr. Eisenberg, p. 30-32; District Court Hearing Tr., p. 67-68. The Ohio Court of Appeals was not presented with this information. The district court held that this information was "'simply more of the same type of evidence which the Ohio Supreme Court already held does not mitigate the aggravating circumstance of a 'senselessly cruel aggravated murder in the course of an aggravated robbery.'" J.A. at 185 (quoting *State v. Williams*, 600 N.E.2d 298, 303 (Ohio Ct. App. 1991)). Under Ohio's death penalty statute, however, this may have been relevant evidence of a mental defect or disease. *See* OHIO REV. CODE 2929.04(B)(3) (1982). *See also Williams*, 529 U.S. at 398 (noting that borderline mental retardation is valuable mitigating evidence when viewed together with a horrific childhood).

assistance of counsel and other claims lacked merit and therefore dismissed the petition. In addition to denying the petition, the court, based upon the reasons stated in its ninety-six page opinion, declined to issue Williams a certificate of appealability.

Williams filed a motion to reconsider. Upon reconsideration, the court amended its order and issued a certificate of appealability on the question of whether Williams's petition was governed by the AEDPA. Williams appealed that issue to this court and requested a certificate of appealability on all issues raised in his petition. We held that the AEDPA governed Williams's case despite the fact that he filed his notice of intent to file a petition prior to its effective date. *See Williams v. Coyle*, 167 F.3d 1036 (6th Cir. 1999). We then issued a certificate on the four issues Williams raises here.

## II. Procedural Default

Before we reach the merits of any of Williams's claims, we must address the Warden's argument that Williams procedurally defaulted his *Brady* and Eighth Amendment claims by failing to raise them at the earliest opportunity.

When a state prisoner defaults on his "federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (citations omitted). In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), we set forth a four-part test for determining whether a court is procedurally barred from reviewing a state prisoner's federal constitutional claims. First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction--that is, whether the state courts

actually based their decisions on the procedural rule. Third, the federal court must consider whether the procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. *See id.* A procedural rule is adequate only when it is firmly established and regularly followed at the time it was applied. *See Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998). The rule would be an independent basis for disposition of a case if the state courts actually relied on the procedural bar. *See Harris v. Reed*, 489 U.S. 255, 261-62 (1989). Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice. *See Maupin*, 785 F.2d at 138. Based on this test, we do not believe we can find that Williams procedurally defaulted on his *Brady* or Eighth Amendment claims.

### A. Brady *Claim*

We do not believe we need go any further than the first factor of inquiry in determining whether Williams procedurally defaulted his *Brady* claim. Before we explain why, we provide a detailed procedural background. Williams claims to have alleged a *Brady* violation in his first petition for PCR. The petition alleged that Williams was denied his "constitutional right to a fair and impartial trial when the prosecutor used against him testimony [of Anderson and Brooks] which was know to be false . . . and which was produced by promises made by the prosecutor to [Anderson and Brooks]." J.A. at 525-26.[3] The trial court dismissed this petition without opinion and Williams never appealed the dismissal.

---

[3] Read in context, Williams's petition for PCR suggests he was not alleging a *Brady* violation; rather, he was arguing that witnesses testified falsely.

Williams, Sr., who claimed during the sentencing phase that, although absent from the home, he was there for Williams whenever he could be there. The record is replete with sworn statements from relatives and friends indicating the exact opposite — that Williams's father was not "there" for any of his children. *See, e.g.,* J.A. at 1063-64 (Deborah Williams Aff.) ("My father wasn't there for us. . . . Dad was never there for us."). Furthermore, his attorneys likely would have discovered additional information that Dr. Schmidt-Goessling had learned in the process of reviewing Williams's life history, such as the fact that Williams was sexually molested by a cousin when he was five or six years old and that Williams had prostituted himself with men for money when he was a teenager. *See* J.A. at 677 (Schmidt-Goessling Aff.).

Finally, had Williams's attorney taken the time to obtain Williams's school, juvenile, and treatment records,[4] they would have discovered that Williams's mother had sought psychological treatment for him at the Child Diagnostic

---

[4] The majority contends that Williams presented no evidence that his counsel did not meet the professional standards of the time. *See* maj. op. *ante* at 31. As noted above, however, Williams presented a 1988 affidavit from Dr. Schmidt-Goessling, which indicated that, according to the standards of the time, "records should [have been] obtained from *schools, treatment sites, courts*, and employers" to prepare for Williams' sentencing hearing. J.A. at 673 (Schmidt-Goessling Aff.) (emphasis added). *See also Williams*, 529 U.S. at 395-96 (noting in the review of a conviction that became final in 1988 that the defendant's school records contained mitigating evidence).

The majority also notes that there is no evidence that Williams's attorneys failed to obtain Williams's school and juvenile records. However, even if Williams's attorneys had these records in their possession, there is no strategic reason for electing not to present at least Williams's school records, which consisted of information on his low IQ of 76, even in light of Williams's lack of cooperation and especially since such evidence may have been relevant to showing a mental defect or disease, one of the mitigating factors under OHIO REV. CODE § 2929.04(B).

psychologist and then to develop a cohesive theory of mitigation").

In light of all this evidence, the attorneys' preparation was wholly inadequate. Williams's attorneys not only failed to speak with his core family members, who were willing to testify on his behalf, but also failed to make efforts to obtain records to learn and gather the background information necessary to support their own theories of mitigation. Indeed, the attorneys did not even attempt to contact Williams's mother, nor did they contact his other sister Pamela, or his mother's sister and his aunt Shirley Boykin, who had lived with Williams and his family at one point, all of whom asserted that they would have testified on Williams's behalf if asked.

Had Williams's attorneys simply discussed Williams's life with core family members such as his mother, his sister Pamela, and his aunt Shirley, and interviewed Williams's sister Deborah for more than a mere five minutes, they likely would have discovered the following possible mitigating information: (1) that Williams's mother often chose abusive partners, including Williams's stepfather, and that Williams witnessed some of this abuse, including at least one instance in which Williams's mother was hospitalized, *see* J.A. at 676 (Schmidt-Goessling Aff.), 1064 (Deborah Williams Aff.), 1129 (Shirley Boykin Aff.); (2) that Williams's father smoked marijuana and sold large quantities of marijuana in his store, *see* J.A. at 1065 (Deborah Williams Aff.), 1124 (Robert Thomas Aff.), 1129 (Shirley Boykin Aff.); (3) that Williams was using drugs as serious as cocaine by age thirteen, *see* J.A. at 1065 (Deborah Williams Aff.); (7) that only one of the five Williams children had graduated from high school, *see* J.A. at 1071 (Bonnie Williams Aff.), 1102 (Pamela Williams Aff.); and (8) that, as a child, Williams was whipped as often as three or four times a week by his father, including with a switch, belt, and extension cord, *see* J.A. at 1104 (Pamela Williams Aff.). The attorneys may have also obtained information from Williams's relatives that is in direct contradiction to the harmful testimony given by Lewis

Williams did not raise the issue--assuming his first PCR petition did raise it--in either his second or third petitions for PCR. This despite the fact that his third petition for PCR contained information that would suggest a possible *Brady* claim: an affidavit dated February 17, 1988, from Gary English, a jail mate of Williams and Anderson, which stated that English overhead Anderson telling Williams he, Anderson, was going to get a lesser sentence for testifying against Williams. The text of the affidavit makes clear that the conversation took place prior to the end of Williams's trial which would mean Williams was aware of the alleged deal prior to the end of his trial.[4] Rather than raising the claim there, Williams chose to wait until his fourth PCR proceeding to raise the *Brady* claim.

In alleging the *Brady* violation in his fourth PCR petition, Williams pointed to several facts that led him to believe a deal existed between the prosecution and the witnesses--namely, that after their testimony each witness received a reduced sentence. The petition also included an affidavit from Jeff Layman, an investigator hired by Williams's counsel, which stated that while visiting Anderson at the Marion Correctional Facility, Anderson informed Layman that the prosecution promised to recommend a reduced sentence if he testified against Williams. *See* J.A. at 1313-14. Curiously, the petition did not include English's affidavit nor did it include an affidavit from Anderson. The trial court

---

[4] Specifically, the affidavit reads,

Anderson told me after talking to the police that he knew about [Williams] because the police told him about the case. Anderson said that he might as well sink [Williams] for what [Williams] had done to him.

. . . .

Anderson told [Williams] that . . . the prosecutors were going to give him, Anderson, a bill, meaning lesser time. Anderson said [Williams] should never have crossed him.

. . . .

After Anderson got back from court, [Williams] told Anderson that he had lied. Anderson said, "Better you than me."

J.A. at 880.

dismissed the claim finding it was barred by res judicata because it "should have been considered on direct appeal." The court of appeals and the state supreme court affirmed on that reasoning.

Nevertheless, Williams raised the claim again in his fifth petition for PCR, this time including an affidavit from Anderson stating that he made a deal with the prosecution. Again the trial court dismissed the *Brady* claim on the ground that it was barred by res judicata. It then went on to state, "[f]urther, these exhibits fail to present substantive grounds upon which relief can be granted." In his appeal from that dismissal, Williams alleged that it was error for the trial court to dismiss the petition on the ground of res judicata because his claim was based upon evidence outside the record--an affidavit from Anderson--and Ohio law did not apply the doctrine to claims supported by evidence outside the record. Williams also stated that the trial court erred by failing to grant his petition as to the *Brady* claim. The court of appeals rejected Williams's contention that evidence outside the record prevents a court from applying res judicata to procedurally bar a claim. It stated,

Defendant's seventh assignment of error contends the prosecution presented false testimony from Michael Anderson and concealed a deal to obtain his testimony, thereby depriving defendant of effective counsel. . . . Defendant contends he is entitled to file successive PCR Petitions, despite the denial of prior PCR Petitions rasing the same grounds, whenever he presents new evidence to support the claims.
    Contrary to defendant's argument, Ohio law does not grant *carte blanche* to file successive PCR Petitions endlessly. . . . Trial courts are not required to entertain successive petitions which allege the same grounds as earlier petitions. . . . Defendant has failed to show that the trial court abused its discretion by dismissing these claims in his fifth PCR.
. . . .

Any preparation for a capital case should involve obtaining extensive background of the defendant including the defendant's developmental experiences, the family of origin's functioning and dynamics, the parenting capacities of the defendant's parents, the defendant's intellectual functioning, including but not limited to academic and work performance, the defendant's work capacities and experiences, the defendant's ability to relate to others both in intimate and social situations, the defendant's sexual and marital history, the defendant's medical history, and the defendant's psychological functioning across his lifetime.

J.A. at 672-73 (Aff. of Dr. Nancy Schmidt-Goessling, ¶ 7). Dr. Schmidt-Goessling further explained that such information should be pursued through "extensive interviews of family members, including aunts and uncles, grandparents, cousins, etc. as well as the nuclear family" and that "records should be obtained from schools, treatment sites, courts and employers." J.A. at 673 (Aff. of Dr. Nancy Schmidt-Goessling, ¶ 8). According to Dr. Schmidt-Goessling, in this case, defense counsel failed adequately to research Williams's background for possible mitigating information by failing to (1) make collateral contact with Williams's family, friends, teachers, employers, and significant others; (2) obtain records of prior treatment sites for Williams and Williams's school and work records; and (3) obtain an independent psychiatric/psychological evaluation of Williams. J.A. at 673-74; *see also* J.A. at 697-702 (1988 Aff. of Gerald G. Simmons, Esq.) (noting that the performance of Williams's attorneys at the sentencing phase constituted ineffective assistance of counsel because the attorneys failed to investigate Williams's family life and failed to hire a psychological expert to explain Williams's behavior in light of psycho-social development); J.A. at 1096-1100 (1987 Aff. of Dr. Susan D. Schorr) (asserting that Williams's attorneys failed to develop a complete life history of Williams through interviews, failed to collect necessary records or documentary evidence, and "further failed to present this to a licensed

Additionally, I do not believe that the investigatory actions of Williams's attorneys can reasonably be considered a "strategic choice[] made after [a] less than complete investigation . . . [such] that *reasonable professional judgments* support[ed] the limitations on [their] investigation." *Strickland*, 466 U.S. at 690-91 (emphasis added). Indeed, one would be hard-pressed to find any situation in which it would be sound professional judgment for an attorney not to inform a witness in a capital sentencing hearing of the very purpose of the hearing. And yet, Williams's attorneys failed to explain such purpose to two key sentencing witnesses, Williams's father and his sister Deborah. J.A. at 1061 (Aff. of Lewis Williams, Sr.) (noting that the attorneys "did not fully explain to [him] the purpose of [his] testimony or to what [he] would be testifying"); J.A. at 1066 (Aff. of Deborah Williams) (stating that "[a]lthough [she] was contacted by Lewis's trial attorney, . . . [he] spent only about five minutes interviewing [her]" and "[t]his was just prior to [her] testimony"). Such failure to inform *two* of Williams's *three* witnesses, especially the only two family members to testify during the sentencing hearing, negated the very reason for having these witnesses testify on behalf of Williams in the first place because it did not allow either witness an opportunity to think of the events or disadvantages in Williams's life that would have helped to support a life sentence recommendation as opposed to a death sentence.

Furthermore, I do not believe that there is any basis for concluding that the attorneys' decisions limiting which family members to interview or the attorneys' failure to request pertinent records concerning Williams's psycho-social and intellectual development resulted from the exercise of reasonable professional judgment or sound strategy. *Cf. Williams*, 529 U.S. at 395-96 (noting the importance of the defendant's school and juvenile records). Dr. Nancy Schmidt-Goessling, a psychologist who was familiar with the type of preparation required in capital cases, asserted in her affidavit of January 1988 that, according to the standards at the time:

Defendant raised the same claims in his fourth PCR Petition and made no attempt to show good cause for permitting him to raise them again belatedly with additional evidence. That Michael Anderson testified falsely at trial and the prosecution concealed promises of lenient sentencing to induce his testimony were arguments raised before. Defendant's fourth PCR Petition was based on an affidavit of investigator Jeff Layman and . . . . Defendant's fifth Petition merely adds an affidavit in which Anderson recants his trial testimony. However, recanted testimony is suspect and does not generally warrant a hearing. . . .

*State v. Williams*, No. 68613, 1996 WL 17333 at *2 (Ohio Ct. App. Jan. 18, 1996) (unpublished opinion) (internal citations omitted). The court did not go on to address the merits of the claim. The Supreme Court of Ohio affirmed without opinion.

Those dismissals, the Warden argues, establish a procedural bar to this court hearing Williams's *Brady* claim. Pointing to our decisions in *Wong v. Money*, 142 F.3d 313 (6th Cir. 1998), and *Norris v. Schotten*, 146 F.3d 314 (6th Cir. 1998), the Warden asserts that the doctrine of res judicata is an adequate and independent state ground for barring federal review.

After reviewing Ohio's doctrine of res judicata, we conclude that while it seems likely that Williams did procedurally default his *Brady* claim, the Ohio courts have not provided us with enough analysis to hold that Williams defaulted his claim. Under Ohio law, the doctrine of res judicata will bar a party from raising issues that it had an opportunity to raise at an earlier proceeding. *See State v. Roberts*, 437 N.E.2d 598, 601 (Ohio 1982) (stating that "the petitioner is precluded by the doctrine of res judicata from asserting constitutional issues in this post conviction proceeding since she failed to raise these issues at the earliest possible time. . . ."); *State v. Johnson*, No. 55295, 55811, 55812, 2000 WL 1146809 at *1 (Ohio Ct. App. Aug. 8, 2000); *State v. Resh*, 707 N.E.2d 531, 538 (Ohio Ct. App.

1997). This doctrine applies equally: in post-conviction proceedings, barring claims for relief when the petitioner could have raised the issue on direct appeal but did not, *see State v. Perry*, 226 N.E.2d 104 (Ohio 1967); to claims raised in federal habeas proceedings that were not raised on appeal from a trial court's dismissal of a petition for post-conviction relief but could have been, *see Brooks v. Edwards*, No. 95-3775, 1996 WL 506505 at *5 (6th Cir. Sept. 5, 1996); and to claims that a successive petition for post-conviction relief raises that could have been raised in an earlier post-conviction proceeding but were not, *see State v. Slagle*, No. 76834, 2000 WL 1144947, at *10 (Ohio Ct. App. Aug. 10, 2000); *State v. Mullins*, No. 10499, 1982 WL 4956, at *1 (Ohio Ct. App. April 14, 1982). When the claim raised is based on evidence outside the record, the rules change a bit. But how the rules change appears to depend on which opinion you examine. For instance, some courts appear to suggest all that matters is whether the claim is based on evidence outside the record and could not have been appealed on the original record: "[E]vidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record." *State v. Combs*, 652 N.E.2d 205, 209 (Ohio Ct. App. 1994). Thus, a narrow reading of those cases suggests that the question of whether the petitioner could have obtained the evidence earlier is of no consequence. Others find that question important, and require not only that the evidence is outside the record but also that the party presented the claim when the party could have reasonably obtained the evidence. *See Maples v. Coyle*, 171 F.3d 408, 421-22 (6th Cir. 1999); *Slagle*, at *3 ; *Resh*, 707 N.E.2d at 538 ("Res judicata does not apply because [the defendant] could not have reasonably discovered the attached evidentiary materials at or before trial."). Still other sources have stated the issue as whether the party "could have known of the error in time to raise it at trial or on appeal." 3 Baldwin's Ohio Prac. Crim. L. § 83.4 (West 1996).

Williams does not address the varying interpretations of the doctrine, choosing simply to adopt the one most favorable to him. Applying that interpretation, he argues that because his

the sentencing hearing. As a result, the court also failed to uncover how the attorneys' failure to conduct a proper investigation prevented them from laying the very foundation for their mitigation theories and effectively left Williams without any theory of mitigation at all.

### A. Analysis Of Pre-Hearing Investigation

First, I believe that the Ohio Court of Appeals unreasonably determined that Williams did not demonstrate that his attorneys' pre-hearing investigation and preparation fell below an objective standard of reasonableness. At the outset, I note that the lack of investigatory actions by Williams's attorneys cannot reasonably be considered a "strategic choice[] made after *thorough* investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690 (emphasis added). The investigation by Williams's attorneys was anything but thorough, consisting solely of one thirty-minute interview with Williams's father before the sentencing hearing; one five-minute discussion with Williams's sister Deborah, just immediately before she gave her testimony at the hearing; an interview of unspecified time with the mother of one of Williams's childhood friends,[3] and a request for "a very limited psychiatric evaluation from the Cleveland Court Clinic [in 1983] that did not meet the usual standards of investigation for a mitigation psychiatric/psychological evaluation." J.A. at 674 (Aff. of Dr. Nancy Schmidt-Goessling). To conclude that such investigatory actions were constitutionally adequate is not only completely erroneous but objectively unreasonable. After all, the very core of a capital sentencing hearing is the jury's balancing of evidence of mitigating and aggravating factors. If only a minimal investigation is completed by defense counsel to gather evidence of mitigating factors, then there is nothing to place in the balance before the jury to the tip the scales in favor of a life sentence.

---

[3] This witness, Ms. Packnett, did not prepare and sign an affidavit for Williams's state post-conviction proceedings or for the district court.

that, but for counsel's unprofessional errors, the results of the proceeding would have been different.'"

J.A. at 185 (citing *Strickland*, 466 U.S. at 688, 694).

## II.  ANALYSIS

After careful review, I conclude that the Ohio Court of Appeals' decision on Williams's claim of ineffective assistance of counsel during the sentencing phase constituted an unreasonable application of clearly established Supreme Court precedent.  In my opinion, although the Ohio Court of Appeals correctly identified the governing legal principles in this case, it then unreasonably applied them to the facts.  In concluding that the performance of Williams's attorneys was not deficient because the attorneys had a theory of mitigation and presented some (although very little) evidence in support of that theory to the jury, the Ohio Court of Appeals misunderstood the purpose of allowing a capital defendant to present mitigating evidence at his sentencing hearing.  In capital cases, the outcome of a sentencing hearing turns upon the weight of the competing evidence presented by the parties. It is a simple matter of weighing aggravating factors against mitigating factors.  Thus, Williams's attorneys were obligated to do more than simply think of a theory and present sparse evidence in support in order to provide effective assistance of counsel to Williams in his sentencing hearing; they also needed to investigate and gather facts to support that theory and to present the theory in a coherent manner.  It was objectively unreasonable for the Ohio Court of Appeals to conclude, without any analysis whether Williams's attorneys were deficient in collecting readily available evidence of mitigating factors, that Williams's attorneys provided him effective assistance of counsel during the sentencing phase of his trial.  In other words, the Ohio Court of Appeals was objectively unreasonable in failing to recognize that the affidavits introduced in the post-conviction proceedings revealed the failure by Williams's attorneys adequately to investigate his background for meaningful mitigating factors and to prepare mitigation witnesses for their testimony during

claim is based on evidence outside the record, the delinquency in raising it is absolved.  Apparently the Ohio courts did not agree.  The court of appeals in dismissing his fourth PCR appeal held, "The claims raised in this assignment of error could have been raised on appeal or through the previous petitions for post-conviction relief."  *Williams*, 1993 WL 95548, at *1.  The trial court's ruling was similar.  The courts presumably based these holdings on the ground that Williams could have reasonably obtained the evidence supporting his *Brady* claim earlier that his fourth petition for PCR.  But while the evidence suggests that to be case, the Ohio courts failed to discuss any of that evidence, make specific factual findings on the matter, or  provide any reasoned analysis. Without such analysis, we are unwilling to rule that the claim is procedurally barred.[5]

### B.  Jury Instruction

The Warden argues that Williams procedurally defaulted his Eighth Amendment jury instruction claim by failing to make a contemporaneous objection to the instruction and failing to raise the issue on direct appeal.  We disagree.  It appears that Williams raised the issue of the court's jury instruction regarding the degree of agreement needed to return a life sentence recommendation on his direct appeal to the Ohio Supreme Court.  That court, though it stated that the issue had not been briefed or raised below, went on to decide the case on the merits.

> In his twelfth proposition, appellant argues that the jury should have been instructed that a life imprisonment sentence does not require a unanimous vote.  Not only was this issue not briefed and decided below, but this alleged reading of R.C. 2929.03(D)(2) ignores the

---

[5]The failure is also troubling in light of Ohio's requirement that when a trial court "dismisses [a] petition, it . . . make and file findings of fact and conclusions of law with respect to such dismissal."  Ohio Rev. Code Ann. § 2953.21(C); *see also State v. Lester*, 322 N.E.2d 656, 659 (Ohio 1975).

requirement set forth in Crim. R. 31(A) that all verdicts in criminal proceedings be unanimous. Furthermore, we rejected this argument in *Jenkins* . . . and held that: "In returning a sentence of life imprisonment under R.C. 2929.03(D)(2), the jury's verdict must be unanimous."

*Williams*, 490 N.E.2d at 913 (citation omitted). We do not believe that we can read this decision as resting on a procedural bar as it simply says in passing that Williams failed to comply with the procedural rules.[6] Accordingly, Williams is not barred from raising the issue now.

Because we find that we are not procedurally barred from reviewing either claim, we move to Williams's assignments of error.

### III.  Williams's Claims

#### *A.  Evidentiary Hearing*

In his first assignment of error, Williams alleges the district court should have granted him an evidentiary hearing on his *Brady* and ineffective assistance of counsel claims. In point of fact, the district court did grant and proceed with an evidentiary hearing. At the hearing, Williams introduced thirty exhibits, including an affidavit from Anderson claiming that he lied at Williams's trial. Williams also called two witnesses, including a mitigation expert who testified that Williams's trial counsel were ineffective in preparing for the mitigation stage of the trial. Williams did not, however, call Anderson as a witness. His counsel informed the court at a pre-hearing conference that Anderson was unavailable in a psychiatric ward at Allen Correctional Institution. As it turned out, Anderson was not in a psychiatric ward but in the

---

[6]Williams's brief to the court of appeals is not in the appendix but the Ohio Court of Appeals's decision in his direct appeal decision discusses and rejects his claim that the instruction requiring a unanimous verdict for a life sentence was error.

an attorney to provide effective assistance of counsel" and that "Williams 'fail[ed] to explain how the lack of consultation affected the outcome of the [hearing].'" J.A. at 181 (citation omitted). The district court also determined that Williams had failed to "identify the information in [his] records [from school and the juvenile and correctional facilities in which he had been incarcerated] that would have convinced a jury to spare his life" and that Williams's attorneys were not "ineffective for not requesting assistance of 'a psychological expert'" in light of Williams's refusal to cooperate with psychologists during a pre-trial competency hearing and his refusal "to speak ill of his family" at his sentencing hearing. J.A. at 182-83.

Finally, the district court held that the presentation of mitigating evidence by Williams's attorneys was not ineffective. In so doing, the district court noted that Williams's attorneys presented two theories of mitigation, that Williams's troubled childhood had led him to a life of crime and that the criminal justice system had let Williams down by not rehabilitating him. The district court further stated that "Williams himself thwarted the force of these arguments by refusing to disclose any relevant information." J.A. at 184. The district court conceded the weaknesses of the pre-hearing investigation and the presentation of mitigating evidence, however, stating:

> In the end, the Court agrees that the defense presented little (if any) relevant mitigating evidence to the jury at the hearing. However, this absence resulted more from the lack of such evidence than from the ineffectiveness of Williams' counsel. To be sure, defense counsel could have been more thorough in the pre-hearing investigation and the presentation of evidence. The defense theories of mitigation could have been better developed. Nevertheless in light of the absence of any mitigating evidence, the Court concludes that even if counsel's performance 'fell below an objective standard of reasonableness,' there is not 'a reasonable probability

In his petition for post conviction relief, Williams submitted a mass of affidavits. Such affidavits, however, add only additional detail to support his original mitigation theory: that he pursued a life of crime to compensate for a troubled childhood. Such evidence does not demonstrate the diminished responsibility that the legislature considered to be mitigating. *Therefore*, we do not believe that counsel's performance was deficient by failing to present certain evidence during the mitigation phase of the trial. The absence of such testimony did not prejudice Williams so as to render the result unreliable.

*State v. Williams*, 600 N.E.2d 298, 304 (Ohio Ct. App. 1991) (citations omitted) (emphasis added).

The district court also concluded that Williams had not been denied effective assistance of counsel during the sentencing phase of his trial. Specifically, the district court determined that:

the information contained in [the post-conviction] affidavits [of family members, friends, and professionals was] simply additional evidence of Williams' troubled childhood — a topic that counsel presented at the mitigation hearing. . . . That [counsel] chose to call as witnesses those persons directly involved in his upbringing (his father and sister) to establish the conditions of his childhood, rather than relying upon the testimony of more extended family and friends, was a reasonable tactical choice. . . . Even assuming that counsel's failure to interview more of Williams' family members and friends was unreasonable, there is nothing in the record to suggest that had this additional information been presented to the jury their recommendation would have been different.

J.A. at 179-80. With regard to the allegations that Williams's attorneys failed to prepare witnesses for their testimony, the district court held that "there is no minimum number of meetings between counsel and witnesses necessary to prepare

general population and therefore available. Thus, his affidavit was inadmissible hearsay.

After the hearing, the district court ruled that the AEDPA prohibited it from using the evidence in evaluating the merits of Williams's claims. Specifically, the court found that Williams had failed to develop the state record and did not meet one of the exceptions in § 2254(e)(2) for obtaining an evidentiary hearing under those circumstances: the request was not based upon a new constitutional rule nor was it based upon newly discovered evidence. "The evidence presented at the [evidentiary] hearing was not newly discovered material evidence . . . at best, it consisted of new interpretations of evidence presented (or not presented) at Williams' trial. While the interpretations are arguably new, the 'factual predicate' from which they are derived is not." J.A. at 163.

Despite the court's conclusion that it was prohibited from using the evidence presented at the evidentiary hearing, it proceeded to evaluate the evidence. It began in footnote twenty-six: "As a practical matter, whether the Court disregards the evidence received at the hearing is of no consequence, for, as will shortly be discussed, Williams is not entitled to relief even upon consideration of such evidence." J.A. 163. Giving Williams every possible advantage, the district court included the hearsay affidavit in its evaluation as well, stating, "Anderson's affidavit, even if it were not hearsay, must be viewed with extreme suspicion. . . . [Anderson's] inadmissible affidavit is insufficient to establish that the State had promised him a reduced sentence in exchange for testimony against Williams." J.A. at 168-69 (footnotes omitted). In evaluating the ineffective assistance of counsel argument, the district court said, "Williams would fair (sic) no better even were the Court to consider the evidence presented at the evidentiary hearing." J.A. at 185 n.57. It then went on to consider that evidence, finding that the mitigation expert's testimony did not support a finding of deficient performance by Williams's counsel or the prejudice required to overturn the sentence.

Nevertheless, Williams argues that he is entitled to an evidentiary hearing. Ignoring the only conclusion one can reach from reading the district court's opinion--that the court considered the evidence--Williams begins by observing that his case is outside the scope of § 2254(e)(2) because he did not fail to develop the record in state court. Rather, he asserts, the state courts incorrectly refused to allow him to develop the record. Because the case is not governed by § 2254(e)(2), he reasons, we must analyze his request for an evidentiary hearing under the rules that governed pre-AEDPA requests, namely, *Townsend v. Sain*, 372 U.S. 293 (1963). And under those rules, he concludes, he is entitled to an evidentiary hearing on both issues.[7] We disagree.

As the district court did in fact evaluate the evidence presented at the evidentiary hearing, what Williams is actually requesting is a second federal evidentiary hearing. The sole purpose of which--given that the district court already considered the affidavits and testimony of the mitigation expert--would be to introduce the testimony of Anderson rather than relying on his affidavit as Williams had previously done. In hope, we suppose, that the district court would look more favorably on Anderson's statement if he were there in person. But the district court's opinion suggests otherwise. It did not say that Anderson's statement was incredible because Anderson was not before the court; rather it found the statement lacked credibility because Anderson waited nine

---

[7] Under *Townsend*, a petitioner is entitled to an evidentiary hearing if:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313.

---

that he was twenty-four years old, *see* J.A. at 2103; that he first became involved with the law at age nine for running away from home, *see* J.A. at 2104-05; that he spent many of his formative years at different boys' institutions, *see* J.A. at 2105-09; and that the highest grade he had completed was the ninth grade, *see* J.A. at 2103. Williams also testified that, although he had the option of going to jail or staying at home when he was arrested for the first time as an adult, he went to jail "to try and hurt [his] family, to see if they really cared." J.A. at 2112.

The last state court to render a written decision on Williams's claim of ineffective assistance of counsel during the sentencing phase was the Ohio Court of Appeals in a post-conviction proceeding.[2] The Ohio Court of Appeals denied this claim, stating that the additional evidence that Williams had presented in his post-conviction petition was merely cumulative to the testimony already given during the sentencing phase of his trial and that it did not demonstrate the required diminished responsibility. It then held that Williams's counsel performance was not deficient. It explained:

Here, Williams presented a variety of witnesses in the penalty phase. Olivia Packnett, the mother of one of Williams' friends, testified that Williams has always been well-behaved and respectful at home. Debra Williams, defendant's sister, testified about the instability of defendant's home life. Lewis Williams, Sr., defendant's father, testified that he did not spend much time with defendant and that defendant's mother rejected him. Defendant himself proffered unsworn testimony of his criminal conduct that started at the age of nine which was designed to get his family's attention. He stated that he was blamed for all of the family's problems and spoke up about his troubled relationship with his mother.

---

[2] On November 20, 1991, the Supreme Court of Ohio dismissed the appeal without opinion. As did the majority, I assume the dismissal was based upon the rationale of the Ohio Court of Appeals.

Ms. Packnett was the first witness to testify during the sentencing phase. She testified that she had known Williams since he was a child; that Williams often stayed at her house when there was no gas at his mother's house and when his mother put him out; that she had never known Williams to be violent; and that she believed Williams to be a respectful and "excellent fellow." Joint Appendix ("J.A.") at 2083-88. On cross-examination, however, Ms. Packnett revealed that she was unaware of Williams's repeated troubles in juvenile court and his arrests as an adult for grand theft and aggravated robbery. J.A. at 2089-92.

Deborah Williams was the second witness to testify. She testified that her parents separated when Williams was about six years old; that Williams had no stable home; and that he often slept over at friends' homes or in her car. J.A. at 2093-96. According to Deborah Williams, her brother's attorneys were derelict in preparing her to give testimony before the jury, having only spoken to her for five minutes immediately before she testified and advising her only to "explain [Williams's] life" at the hearing. J.A. at 1066.

Lewis Williams, Sr. followed Deborah Williams at the sentencing hearing. He testified that he "wasn't with the family as much as maybe [he] should have been, but whenever [Williams] called [him] or anything, [he] was there. Whenever [he] could be with [him]." J.A. at 2099. Lewis Williams, Sr. also testified that he felt that Williams "cared more for his mother then[sic] he did himself, but times, as if he was being rejected by his mother for some reason." J.A. at 2101. According to Lewis Williams, Sr., his son's attorneys "did not fully explain to [him] the purpose of [his] testimony or to what [he] would be testifying." J.A. at 1061. On top of that, Lewis Williams, Sr. claimed that the attorneys interviewed him for twenty-five to thirty minutes only and asked him very few questions about Williams's background. J.A. at 1061.

Williams was the last person to take the stand and gave an unsworn statement to the jury. On the stand, Williams stated

years to reveal his alleged perjury and the state did not have the authority to promise Anderson what he alleges it promised him. Williams has not presented us with an authority, nor have we found any, that would indicate such a hearing is required. The principles applicable to this situation, moreover, militate against such a hearing. *See McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998). Williams has had the opportunity for a full and fair hearing in federal court. If we were to analogize Williams's request to one governed by § 2254(e), moreover, Williams would not be entitled to a second hearing. Any undeveloped factual allegations--the absence of testimony by Anderson--are a result of Williams's failure. Williams does not meet one of the listed exceptions. Accordingly, we reject Williams's argument that he is entitled to a second federal evidentiary hearing.

### B.  Standards of Review

Because the AEDPA applies to Williams's petition, *see Williams v. Coyle*, 167 F.3d 1036 (6th Cir. 1999), we review his petition under the standards set forth in 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Thus, the Supreme Court has held, "[t]he threshold question under [this section] is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became

final." *Williams v. Taylor*, 569 U.S. 362, 390 (2000).[8]  A rule of law is clearly established if it is directly based on a "holding[], as opposed to the dicta, of [the Supreme Court] as of the time" the conviction became final.  *Id.* at 412.

A decision can be contrary to such law in one of two ways. First, when the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent. *See id.* at 406-07.  Second, when the state court "applies a rule that contradicts the governing law set forth in" Supreme Court cases.  *Id.* at 406.

A decision is an unreasonable application of clearly established federal law if it identifies the correct principle of law but unreasonably applies it.  *See id.* at 407.  "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . .  Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must also be unreasonable."  *Id.* at 410 (original emphasis).

We pause here to emphasize that the Court did not, contrary to some opinions from this and other circuits, hold that a

---

[8]We pause here to note an apparent discrepancy in the Supreme Court's opinions.  Justice Stevens wrote for the majority in parts I, III, and IV of the opinion and Justice O'Connor wrote for the majority in part II of the opinion.  *Williams v. Taylor* dealt with the Virginia Supreme Court's opinion on collateral review.  As noted above, in part III of his opinion Justice Stevens wrote that a law is clearly established if it was decided at the time Williams's conviction became final.  In part II of her opinion, also for the majority, Justice O'Connor wrote that we look to the "relevant state court-decision" to see whether a law was clearly established.  In *Williams v. Taylor*, the relevant case presumably was the Virginia Supreme Court's decision on collateral review.   These statements, both for the majority, appear inconsistent--at least in the case of *Williams v. Taylor* and in the present case.  Because Justice Stevens's statement is more specific, we follow it.

§ 2929.04(B) (1982).  The statutory mitigating factors that may considered by the jury in a capital case include the following:

(1)   Whether the victim of the offense induced or facilitated it;

(2)   Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

(3)   Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

(4)   The youth of the offender;

(5)   The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6)   If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7)   Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

OHIO REV. CODE § 2929.04(B)(1)-(7) (1982).

During the sentencing phase of Williams's trial, his attorneys presented the testimony of three persons: (1) Olivia Smith Packnett, the mother of one of Williams's childhood friends; (2) Deborah Williams, Williams's younger sister; and (3) Lewis Williams, Sr., Williams's birth father.  Williams then gave unsworn testimony before the jury on his own behalf.

on his psycho-social development and the mitigating circumstances resulting therefrom.

The Eighth Amendment requires that a jury be permitted to consider evidence proffered by the defendant regarding the circumstances of the crime and the defendant's background and character during the sentencing phase of a capital trial. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). As the Supreme Court has repeatedly recognized, because the adversarial testing process "generally will not function properly unless defense counsel has done some investigation . . . 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland*, 466 U.S. at 691); *see also Williams*, 529 U.S. at 397 (acknowledging that the defendant's trial counsel had an "obligation to conduct a thorough investigation of the defendant's background").[1] Therefore, if counsel's failure to investigate is not due to strategic concerns and is unreasonable considering all the circumstances, such failure to investigate may constitute ineffective assistance of counsel. *See Strickland*, 466 U.S. at 688-89.

Under Ohio's death penalty statute, a sentencing jury must weigh the aggravating circumstances of a defendant's capital offense against the "nature and circumstances of the offense, [and] the history, character, and background of the offender" before recommending a death sentence. OHIO REV. CODE

---

[1] Although *Williams v. Taylor* was decided after Lewis Williams's conviction became final and thus cannot serve as direct support of my analysis, it is still highly relevant to this case. Like this case, *Williams v. Taylor* concerns the habeas review of an ineffective assistance of counsel claim in a case in which the defendant's conviction became final in 1988. *See Williams v. Virginia*, 360 S.E.2d 361 (Va. 1987), *cert. denied*, 484 U.S. 1020 (1988). Therefore, the Supreme Court's analysis under *Strickland* of the defendant's ineffective assistance of counsel claim in *Williams v. Taylor* sheds light not only on what may be considered reasonable professional norms at the relevant time but also on what conduct by counsel should withstand scrutiny under *Strickland*.

decision might be an unreasonable application if it unreasonably extended or declined to extend an existing principle of law. The Court mentioned that theory, but only in the context of reviewing for the reader what the Fourth Circuit had previously ruled constituted an unreasonable application of the law. The Court began,

> The Fourth Circuit's interpretation of the "unreasonable application" clause of § 2254(d)(1) is generally correct. That court held in *Green* that a state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. . . . Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* at 407 (citations omitted). But the Court then went on to emphasize that it was not ruling on the unreasonable extension principle.

> The Fourth Circuit also held in *Green* [that] state-court decisions that unreasonably extended a legal principle from our precedent to a new context where it should not apply (or unreasonably refuse to extend a legal principle to a new context where it should apply) should be analyzed under § 2254(d)(1)'s "unreasonable application" clause. Although that holding may *perhaps* be correct, the classification does have some problems of precision. . . . *Today's case does not require us to decide how such "extension of legal principle" cases should be treated under § 2254(d)(1). For now it is sufficient to hold that when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's "unreasonable application" clause.*

*Id.* at 1521 (emphasis added) (internal citation omitted).

We will review Williams's jury instruction and ineffective assistance of counsel claims under the standard set forth in § 2254(d). Because the Ohio Supreme Court reviewed the jury instruction claim on direct appeal, our review will focus on that opinion. The ineffective assistance of counsel argument, however, was not reviewed on direct appeal. Whether § 2254(d) applies to issues addressed for the first time in state post-conviction proceedings was not addressed by either party. The Warden simply assumed it did apply and Williams--consistent with his approach to every issue--assumed we review the claim de novo. Nevertheless, we have little doubt that the AEDPA's standards apply to state collateral decisions as well as those on direct appeal. Section 2254(d) draws no distinction between decisions on direct appeal and those in state collateral proceedings, requiring only that the claim "was adjudicated on the merits in State court proceedings." § 2254(d). Further, at least two of our sister circuits have applied the standards to state post-conviction proceedings. *See Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000) (en banc); *Moore v. Gibson*, 195 F.3d 1152, 1165, 1171 (10th Cir. 1999). And more importantly, the Supreme Court's review in *Williams v. Taylor* was of a state court's post-conviction decision. The question still remains which state post-conviction decision we should review. The Ohio courts last addressed the merits of Williams's ineffective assistance of counsel claim in his third PCR proceedings. The court of appeals articulated its reasoning, while the Ohio Supreme Court affirmed without opinion. Because both courts reached the same conclusion, and it is the conclusion rather than the analysis that matters, *see Bell*, 236 F.3d at 160, we think which decision we review is of little import whether we review the decision of the court of appeals or the Ohio Supreme Court. Although we review the state-court collateral decision, we still look to the clearly established law at the time Williams's conviction became final. *Williams*, 529 U.S. at 388-89.

must be highly deferential and must be careful "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "[S]trategic choices made after *thorough investigation of law and facts* relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that *reasonable professional judgments* support the limitations on investigation." *Id.* at 690-91 (emphasis added). In essence, a "defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'" to satisfy the performance prong of the *Strickland* test. *Id.* at 689. With regard to the prejudice prong of the two-part *Strickland* test, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

## I. BACKGROUND

In the state courts, Williams argued that he was denied effective assistance of counsel during the sentencing phase of his trial because his counsel failed to investigate possible mitigating factors adequately and failed to develop and present a coherent theory of mitigation to the jury. Specifically, Williams claimed that his attorneys failed to obtain pertinent background information on him by neglecting to interview family members other than his father and his sister Deborah and by neglecting to request school and juvenile facility records relevant to his psycho-social development; that his attorneys failed to prepare witnesses for the testimony they were to give during the sentencing phase of his trial; and that his attorneys failed to request the appointment of a psychological expert who could comment

established Supreme Court precedent when it is "opposite to that reached by this Court on a question of law" or faces a set of facts that are "materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Id.* at 405. The Supreme Court further explained that a state court decision involves an unreasonable application of clearly established Supreme Court precedent when it correctly identifies the governing legal principle in the case but applies that principle to the facts of the defendant's case in an objectively unreasonable manner. *Id.* at 407-09; *see also Penry*, — U.S. ---, 121 S. Ct. at 1918.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. The Supreme Court has recognized that "[a] capital sentencing proceeding like the one involved in this case . . . is sufficiently like a trial in its adversarial format and in the existence of standards for decision . . . that counsel's role in the proceeding is comparable to counsel's role at trial." *Id.* at 686-87. As the majority notes, a defendant must satisfy the well-known, two-part test set forth in *Strickland* to prove a claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

With regard to the performance prong of the two-part test, a defendant must show that his counsel's representation fell below an objective standard of reasonableness. In reviewing the reasonableness of such counsel's performance, courts

### C.  Jury Instruction

After reading the possible verdicts, the trial court instructed the jury as follows:

> If all twelve of the jury find, by proof beyond a reasonable doubt, that the aggravating circumstances which Lewis Williams Jr. was found guilty of committing murder outweighs the mitigating factors, then you must return such finding to the Court. I instruct you as a mater of law that if you make such a finding, that you have no choice and must recommend to the Court that the sentence of death be imposed upon the defendant, Lewis Williams Jr.
>
> . . .
> On the other hand, if after considering all of the relevant evidence raised at the trial . . . you find that the State of Ohio failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant . . . was found guilty of committing, outweigh the mitigating factors, then you will return your verdict reflecting your decision.
>
> . . .
> That is, you must find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty outweigh the mitigating factors. In this event, you will then proceed to determine which of the two possible life imprisonment sentences to recommend to the court.
>
> . . .
> So you have three options, as I have indicated to you. *Of course, whichever you choose, all twelve of the jurors have to agree and sign in ink.*

J.A. at 2141-44 (emphasis added). That passage, Williams contends, violated his rights because (1) it erroneously instructed the jury on the level of agreement necessary to recommend a life sentence and (2) that this erroneous instruction violated his Eighth Amendment right.

Ohio R.C. § 2929.03(D)(2)[9] simply does not require unanimous agreement to recommend a sentence other than death, Williams contends. Indeed, he argues, the jury *must* recommend a life sentence if even one juror disagrees with a recommendation of death. The trial court's instruction otherwise, he maintains, misinformed the jury about its role in sentencing a capital defendant and therefore violated his Eighth Amendment rights as described in *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

The Ohio Supreme Court rejected that argument and so do we. The Ohio Supreme Court held that, in accord with its decision in *State v. Jenkins*, 473 N.E.2d 264, 306-07 (Ohio 1984), all verdicts must be unanimous under Rule Ohio Criminal Rule 31(A) and consequently, a recommendation of a life sentence must be unanimous. *See State v. Williams*, 490 N.E.2d 906, 913 (Ohio 1986). *Jenkins* was clearly decided before Williams's conviction was final.

In 1996, the Ohio Supreme Court, reached a decision contrary to *Jenkins* in *State v. Brooks*, 661 N.E.2d 1030, 1041 (Ohio 1996). A 1992 opinion by the Ohio Supreme court also suggests that a recommendation of life need not be unanimous. *See State v. Springer*, 586 N.E.2d 96 (Ohio 1992). The *Brooks* court did not mention *Jenkins* but nevertheless appears to overrule it. The *Brooks* decision was over a month after Williams's last PCR request was dismissed; and both *Brooks* and *Springer* were decided after Williams's conviction became final. Williams did not raise the jury instruction issue in his PCR proceedings, moreover,

---

[9] At the time, section 2929.03(D)(2) of the Ohio Revised Code read, If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. Because I disagree with the majority's determination that Williams is not entitled to a writ of habeas corpus because of ineffective assistance of counsel during the sentencing phase of his trial, I respectfully dissent from the corresponding portion of the majority's opinion. Unlike the majority, I believe that the state courts' decision on Williams's ineffective assistance of counsel claim involved an unreasonable application of clearly established Supreme Court precedent, specifically of the legal standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

We review de novo a district court's decision on a petition for writ of habeas corpus. *See Carter v. Bell*, 218 F.3d 581, 590 (6th Cir. 2000). As we previously noted in *Williams v. Coyle*, 167 F.3d 1036 (6th Cir. 1999), this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and under 28 U.S.C. § 2254(d), this court may not grant a writ of habeas corpus for any claim adjudicated on the merits in state court unless the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (2000) (emphasis added); *see also Penry v. Johnson*, --- U.S. ---, 121 S. Ct. 1910, 1918 (2001). In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court explained the precise meaning of the language in § 2254(d)(1), which is at issue here. The Supreme Court explained that a state court's decision is "contrary to" clearly

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of the petition for a writ of habeas corpus.

thereby depriving the Ohio courts of the opportunity to address the apparent conflict between *Jenkins* and *Springer*.

The timing of these decisions requires us to find that the Ohio Supreme Court's decision was not an unreasonable application of nor was it contrary to clearly established law-- in this case *Caldwell*-- at the time Williams's conviction became final. *Caldwell* prohibits the judge or prosecutors from making misleading statements to the jury. Thus, for the decision to have been contrary to or an unreasonable application of *Caldwell*, it would have had to affirm what was then an erroneous statement of the law by the judge that misled the jury. That is, the jury instruction would have to had been an erroneous statement of Ohio law at the time Williams's conviction became final. If it was not, then the instruction was not misleading, and therefore, not in violation of *Caldwell*. At the time Williams's conviction became final, Ohio's highest court read section 2929.03(D)(2) in conjunction with Ohio Criminal Rule of Procedure 31(A) to require jury unanimity for life imprisonment recommendations in capital cases. Therefore, the decision affirming Williams's sentence was not an unreasonable application of or contrary to clearly established Supreme Court precedent.

Williams's second challenge fares no better. He alleges the instruction led the jury to believe that they must return a unanimous recommendation, thereby precluding them from considering any and all mitigating circumstances in violation of *Mills v. Maryland*, 486 U.S. 367 (1988).

The Ohio Supreme Court did not address Williams's second argument; however, it is easily disposed of. We first note that *Mills* was decided after the United States Supreme Court denied certiorari from Williams's direct appeal and therefore was not clearly established law at the time Williams's conviction became final. Even if the law were clearly established, the jury instruction did not run afoul of it or its principles. *Mills* stands for the proposition that a death penalty scheme cannot require unanimity as to the existence

of a mitigating circumstance. *See Mills,* 486 U.S. at 374. Here the jury instruction clearly did not require unanimity as to the existence of a mitigating circumstance only as to the question of whether the aggravating circumstances *as a whole* outweighed the mitigating circumstances as a whole. We do not see how that instruction violates *Mills*.

### D.  Ineffective Assistance of Counsel

If his death sentence is not the result of judicial error, it must be the result of his counsel's error, Williams contends. That error, he argues, was his trial counsel's failure to fully investigate his background for information that they could have presented at the sentencing stage of his trial as mitigating circumstances. If they had, he maintains, they would have discovered additional information that supports Williams's claim that the death penalty should not have been imposed because of his troubled childhood. Specifically, Williams points to testimony that his school test revealed he has a low IQ and statements from family members that he was abused and his father was a homosexual who spent little time with Williams and brought other men around Williams's home. Counsel's failure to present such evidence, he alleges, was deficient performance. Had they presented that evidence, Williams argues, there is a reasonable probability that the jury's recommendation would have been different.

The Ohio courts saw things differently. Williams first raised the claim in his third PCR petition; the court of appeals was the last to provide an articulated decision. Applying *Strickland v. Washington*, 466 U.S. 668 (1984), it found that Williams could not show that his attorneys' decision not to call certain witnesses was deficient performance. The witnesses Williams claims his counsel should have called to testify would have merely provided support for the theory of mitigation that his counsel presented and the jury rejected, the court reasoned. Accordingly, it concluded, counsel's strategic decision not to call these witnesses did not constitute deficient performance. Further, it stated, the failure to present the cumulative evidence did not prejudice Williams as the jury

to obtain a reduced sentence by reason of his testimony. Likewise, the prosecutor stated that he would consider the witnesses' cooperation in disposing of their pending cases. The other evidence Williams offers, Anderson's affidavit, is suspicious on both a legal and a factual basis, as the district court found. Legally, recanting affidavits are always viewed with "extreme suspicion." *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991). The circumstances surrounding the confession are also dubious. Williams's counsel did not offer Anderson as a witness in the district court's evidentiary hearing because, he stated, Anderson was in a psychiatric ward and therefore unavailable. As Respondent points out, however, Anderson was actually in the general population. Both prosecutors, moreover, testified at the evidentiary hearing that they made no such deal with Anderson or Brooks. All these facts led the district court to find Anderson's affidavit incredible, and require us to hold that that finding was not clearly erroneous.

Even if we assume such a deal existed, we do not believe the prosecution's failure to disclose it would have been material. While the jury would not have been aware that a deal existed, it was fully aware of the witnesses' motivation for testifying--the hope of getting favorable treatment from the prosecution in their own cases. Williams's counsel extensively cross-examined the witnesses. Anderson admitted that he hoped his testimony would benefit him in his case. And the prosecution stated it would consider the witnesses' cooperation in determining how to dispose of their cases. Thus, the jury knew of this reason to question the veracity of their Anderson's and Brooks's testimony. We do not believe that knowledge of the existence of an actual deal prior to deliberation would have given the jury a greater reason to question the veracity of Anderson's and Brooks's testimony. At least, not to the level that not knowing undermines confidence in the outcome. *See Byrd v. Collins*, 209 F.3d 486, 518-19 (6th Cir. 2000).

their testimony. First, Anderson, who had been charged with aggravated robbery, was allowed to plead guilty to a lesser-included offense one month after his testimony in Williams's trial. He was sentenced to one and one-half years of incarceration for the offense; however, the execution of the sentence was suspended and he was placed on five years probation. Second, Brooks, who was serving a one year sentence, was allowed to vacate his plea agreement and plead to a lesser-included offense. After doing so, he received a three month-suspended sentence and was placed on six months inactive probation. In addition to this circumstantial evidence, Williams also offers an affidavit from Anderson stating that he did in fact make a deal with the prosecution prior to testifying and that he lied during the trial when he testified that there was no such deal. Williams does not allege that Brooks has recanted his trial testimony that no deal existed between himself and the prosecution. Nevertheless, he argues there was a deal and the existence of that deal was material; therefore, the prosecution's failure to disclose it violated his due process right.

The district court disagreed and held there was no *Brady* violation. While it agreed with Williams that the prosecutor's failure to disclose evidence of a deal between the state and the witnesses would amount to a *Brady* violation, it rejected Williams's argument that the evidence he presented reveals that a deal between the prosecutor and the witnesses existed prior to the trial. The post trial events, it found, are not evidence that a deal existed *prior* to the witnesses testifying. And Anderson's affidavit, it ruled, was not credible. Further, there was no evidence that Brooks ever recanted his testimony. Accordingly, it found no violation and dismissed the claim.

To convince us that the district court erred, Williams must show that the court's factual finding that no deal existed was clearly erroneous. He cannot make that showing. The mere fact that Anderson and Brook's sentences were later altered is not evidence that a deal existed prior to their testimony at trial. In fact, at Williams's trial Anderson testified he hoped

did not accept this theory of mitigation. The Ohio Supreme Court affirmed without opinion, we assume on the same rationale.

We pause here to stress the import of the AEDPA's requirements on our analysis. The AEDPA requires us to review the Ohio court's decision based on clearly established Supreme Court precedent at the time Williams's conviction became final. We are not permitted to rely on Supreme Court cases decided after the court's decision, nor are we permitted to rely on *any* decision by any court other than the Supreme Court in evaluating the Ohio court's decision. Thus, Williams's references to Supreme Court decisions after the time Williams's conviction became final are largely irrelevant. So too are Williams's references to federal circuit court decisions.

At the time Williams's conviction became final, *Strickland v. Washington* was three years old but still the most instructive Supreme Court case on his issue. Under *Strickland*, counsel is deemed ineffective if (1) his performance is deficient and (2) this deficient performance prejudiced the defense. 466 U.S. at 687. A counsel's performance is deficient if he committed errors so serious that he was not performing at a reasonable professional level. The burden is on the defendant to make such a showing by "identify[ing] the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The court warned against the type of hindsight and second-guessing in which Williams asks us to engage.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every

effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

. . . .

In making [its] determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 689-90 (citations omitted). And as to investigative decisions of counsel, the Court also instructed courts to act deferentially.

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.

. . . .

[W]hat investigation decisions are reasonable depends critically on [information supplied by the defendant]. For

As Williams has failed to show that the Ohio courts unreasonably applied *Strickland* in dismissing his ineffective assistance of counsel claim, we affirm the district court's decision to dismiss Williams's ineffective assistance of counsel claim.

### E. Brady *Violation*

Our review of Williams's *Brady* claim will be under pre-AEDPA standards because no state court reviewed the merits of that claim. Under that standard, we review mixed questions of law and fact de novo. *See Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000). Allegations of *Brady* violations are mixed questions of law and fact, accordingly, we review the claim under that standard. *See id.* We review the district court's factual findings only for clear error. *See id.*

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and its progeny, a defendant's due process rights are violated when the prosecution suppresses exculpatory evidence. Exculpatory evidence includes evidence regarding the reliability of a witness. *See United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Bell*, 218 F.3d at 602. Failure to disclose such evidence is material where the evidence creates a reasonable probability of a different result. *See Bagley*, 473 U.S. at 678. A reasonable probability of a different result exists when "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, *supra*).

According to Williams, a deal to exchange lighter sentences for testimony against Williams existed between the prosecution and Anderson and Brooks prior to Williams's trial. That the prosecution did not disclose the existence of the deal, Williams asserts, violated his Fourteenth Amendment due process rights, as interpreted by *Brady*. To support this claim, Williams points to several post-trial events that he alleges raise doubt about the witnesses' testimony that they were not promised a reduced sentence in exchange for

never directly explained.  While one of Williams's attorneys was deceased at the time of the evidentiary hearing, Williams did subpoena the other attorney but did not call him in the evidentiary hearing nor was any affidavit from this attorney ever submitted. Williams, moreover, was uncooperative with the psychologists that evaluated him.  Based on Williams's conduct, counsel may have determined that they would be better served simply having Williams explain his childhood at the mitigation hearing.[11]   The Ohio court's decision was not contrary to or an unreasonable application of clearly established law.

The same is true with respect to the prejudice prong.  As the Ohio Court of Appeals noted, the evidence Williams claims should have been introduced goes to a theory of mitigation that the jury found did not outweigh the aggravating circumstances.  Williams has made no showing, other than merely alleging, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

---

[11] As the district court noted,

> [A]lthough Williams alleges that his counsel were ineffective for not requesting the assistance of a 'psychological expert necessary to explain [his] behavior in light of his psycho-social development,' his own prior conduct likely cautioned counsel against such course.  During a pre-trial competency hearing, Williams had refused to cooperate with psychologists.  In light of this prior conduct, counsel may have reasonably determined not to request any additional (and perhaps futile) expert assistance; instead Williams himself could tell the jury about the conditions of his childhood and its effect upon him, thereby placing his own personal tragedy into consideration and perhaps evoking sympathy from jurors.

To overcome this hurdle, the dissent looks to our recent decision in *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000), a pre-AEDPA case.  The AEDPA, however, prohibits us from relying on such cases--we are only permitted to rely on Supreme Court cases decided at the time Williams's conviction became final.  *Williams*, 529 U.S. at 388-89.  We cannot agree, moreover, that Williams's case approaches the facts in *Williams v. Taylor*, on which the dissent relies.

---

example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.  In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's other litigation decisions.

*Id.* at 690-691.  Assuming a defendant overcomes this high burden, he must still prevail on the second prong before he will receive relief.

To prevail on the second prong, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  Again, we note that it is important to bear in mind that we are not proceeding de novo; instead, we are assessing whether the Ohio court's application of the *Strickland* standard-- and only the *Strickland* standard as it was described by the Supreme Court in 1984--was unreasonable or its decision contrary to the standard.

Applying *Strickland* through the lense of the AEDPA, we do not believe it was unreasonable for the Ohio court to determine that Williams failed to make the required showing.  Section 2929.04(B) of the Ohio Revised Code listed the following items as mitigating factors in death penalty cases:

(1) Whether the victim of the offense induced or facilitated it;
(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;

(4) The youth of the offender;

(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

Ohio Rev. Code Ann. § 2929.04. The only factor that favored Williams was the catchall contained in subsection seven. Williams's counsel presented evidence on this factor in the form of testimony that Williams had a troubled youth. The court's finding that counsel's decision not to introduce redundant evidence about Lewis Williams's troubled youth followed the Supreme Court's guidance and applied "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" that it "might be considered sound trial strategy." 466 U.S. at 689. While further testimony on the mitigating factor, particularly from professionals, might have been helpful, we do not find the court's decision that Williams's counsel were effective to be an unreasonable application of *Strickland*. As the court of appeals noted, Williams's counsel presented a theory of mitigation and provided evidence to support that theory. The jury simply rejected the theory--that is, it rejected the catchall mitigating factor that would include troubled childhoods.

The dissent focuses on this as well, reasoning that had counsel investigated further--that is, spoken to more of Williams's relatives--they could have easily determined that some of what Williams's father testified to was not true. This may well be true. The dissent's analysis, however, overlooks

*Strickland's* requirement that we analyze counsel's investigation in light of the defendant's actions and statements. As the district court noted, Williams was uncooperative with a psychologist in the past and that behavior may have influenced counsel's decision not to have Williams analyzed again. More importantly, Williams had the opportunity to raise with his counsel all the facts he and the dissent claim counsel should have obtained through another method. It is not apparent from the record, moreover, that counsel were unaware of those facts.[10] Several times during Williams's unsworn statement, counsel tried to elicit information from Williams regarding his home life. Williams had the opportunity to raise that and other issues in the mitigation hearing. He chose not to do so, choosing instead to remark how he blamed no one for how he turned out, saying, "I don't want to be hurting nobody by saying anything, you know." J.A. at 2104. Counsel tried to get Williams back on track, but Williams refused.

Williams also complains that had his counsel investigated further, he would have discovered that Williams was tested as having a low IQ. Specifically, had counsel reviewed Williams's records from school--though there is no indication that counsel were not aware of their content--they would have discovered the test results. Such practice is common today, Williams's expert testified before the district court. This argument like much of Williams's argument goes to what is considered standard practice in mitigation hearings today. But as we have pointed out, that is not the question under *Strickland* nor is it the question under the AEDPA. *Strickland* directs the Ohio court to analyze effectiveness based on the then prevailing norms and counsel's perspective at the time. *Id.* at 689. The question is whether Williams's counsel met the professional standards of the time; and Williams has provided no indication that they did not. *See id.* at 687. What counsel knew and why they acted as they did is

---

[10]Thus we do not know whether counsel were aware of Williams's father's conduct and chose not to pursue that avenue as trial strategy for fear it would be adverse rather than helpful.