NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0136n.06

No. 22-5067

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 16, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) ) | |
| PATRICK BAKER, | ) ) | |
| Defendant-Appellant. | ) ) | OPINION |
|  | ) ) | |

Before: MOORE, CLAY, and STRANCH, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** In 2017, a Kentucky jury found Patrick Baker guilty of reckless homicide, robbery in the first degree, impersonating a peace officer, and tampering with physical evidence in connection with the death of Donald Mills. Baker was sentenced to nineteen years' imprisonment in state custody. Two years later, Baker received a pardon for offenses stemming from his conduct related to Mills's death from then-Governor of Kentucky Matthew Bevin. In 2021, however, Baker was federally indicted on one count of unlawfully causing Mills's death through the use of a firearm during and in relation to a drug trafficking offense, based on the same conduct for which he had been pardoned. A jury subsequently found Baker guilty, and the district court sentenced him to a total of 474 months' imprisonment in federal custody. On appeal, Baker argues that (1) his due-process rights were violated because the federal government vindictively prosecuted him after he received a gubernatorial pardon for state-law offenses based on the same underlying conduct; (2) the evidence

presented at trial was insufficient to sustain a conviction; and (3) he is entitled to discovery and an evidentiary hearing on his claims that a government witness testified falsely against him and that the government relatedly violated its *Brady* obligations regarding impeachment material about the same witness. For the reasons that follow, we **AFFIRM**.

## I. BACKGROUND

At around 5:00 AM on May 9, 2014, two men kicked in the door of Donald Mills's home, where Mills and his family were sleeping. R. 140 (Trial Tr. at 97) (Page ID #737). The men claimed to be federal law-enforcement officers. *Id.* at 98 (Page ID #738). One of the men took Mills's wife, Charlene James Mills, and children into a separate bedroom while the other man remained with Mills. *Id.* at 98–99 (Page ID #738–39). According to Charlene, the man who stayed with her husband was taller and "a lot skinnier" than the man who was with her and the children. *Id.* at 101 (Page ID #741). She testified that the taller, skinnier man asked Mills: "Where is the dope, and where is the money?" *Id.* at 99 (Page ID #739). While separated from her husband, Charlene heard five or six gunshots from the other side of the house. *Id.* at 102 (Page ID #742). She testified that she did not hear a struggle or fight prior to the gunshots. *Id.* at 108 (Page ID #748).

As the two men left Mills's house, Charlene retrieved a gun and went out to the porch to fire at the men's vehicle as it pulled away. *Id.* She described the vehicle as a maroon Ford F-150 and said that she had seen the truck parked in her driveway two days prior. *Id.* She did not know who drove the truck two days earlier, but stated that Elijah Messer had exited from the passenger's side of the truck. *Id.* at 108–09 (Page ID #748–49). After the truck drove away, Charlene went to the master bedroom, where she found her husband "laying up against the wall with towels held up

to his chest bleeding to death." *Id.* at 109 (Page ID #749). Mills told her that he did not know who shot him. *Id.* Mills died after being transported to a hospital. *Id.* at 118 (Page ID #758).

At the time of his death, Mills sold oxycodone and would typically keep 600 to 1,000 oxycodone pills in his house at any given time. *Id.* at 106–07 (Page ID #746–47). According to his wife, however, Mills did not have any oxycodone pills in their house during the early hours of May 9, although he did have some Neurontin and Zanaflex. *Id.* at 118–19 (Page ID #758–59). Charlene James Mills testified that it was not a secret in their community that Mills sold oxycodone. *Id.* at 107 (Page ID #747).

Nathan Wagoner testified that in April and May 2014, Wagoner and Baker sold oxycodone to each other, and that Baker was $1,200 in debt to Wagoner as a result of Baker's addiction to oxycodone. *Id.* at 195–96 (Page ID #835–36). Wagoner was friendly with Mills and had obtained oxycodone from Mills since around 2007. *Id.* at 197 (Page ID #837). One or two weeks before Mills was killed, Baker went to Wagoner's apartment and mentioned that he wanted to rob "someone with pills and money," but did not specify whom he intended to rob. *Id.* at 198–99 (Page ID #838–39). Wagoner later talked to Stephanie Smith, who tried to convince him to help Baker rob Mills and told Wagoner that she and Baker "had been staking out Donald Mills' place." *Id.* at 205 (Page ID #845). Smith and Baker had staked Mills's house out "[f]rom an elevated position with binoculars, . . . for, like, two days watching his every move." *Id.* At the time, however, Wagoner did not know Smith was talking about Mills. *Id.* at 205 (Page ID #845). On the evening of May 8, Wagoner returned to Smith's trailer. *Id.* at 206 (Page ID #846). Baker, Christopher Wagner, Steven Hensley, and Wagoner's younger brother, Austin, were all at Smith's

3

trailer. *Id.* Shortly after Wagoner arrived, Wagner and Baker left in a maroon Ford F-150, which Wagoner identified as belonging to Baker. *Id.* at 209, 215–16 (Page ID #849, 855–56).

Wagner testified that, on May 8, Baker gave him a firearm to use for the robbery. *Id.* at 261 (Page ID #901). Baker told Wagner that Mills supposedly had 1,500 Roxicet 30s[1] and $200,000 in cash in Mills's home. *Id.* at 257 (Page ID #897). They then went to Smith's trailer but left in the maroon F-150 shortly after Wagoner arrived. *Id.* at 267–68 (Page ID #907–08). Baker and Wagner drove to Adam Messer's trailer, where they met Elijah Messer. *Id.* at 270 (Page ID #910). The three men smoked meth and discussed the robbery. *Id.* at 273–74 (Page ID #913–14). Wagner testified that it was his impression that Elijah "was the ring leader," and that Elijah wanted Wagner and Baker to conduct the robbery on his behalf because Elijah would be recognized easily as a result of having only one leg. *Id.* at 274–75 (Page ID #914–15). Baker then showed Wagner and Elijah Messer an aerial photograph of Mills's house on Baker's iPad. *Id.* at 276–77 (Page ID #916–17). Wagner testified that the plan was for him, Baker, and Elijah Messer to split the pills and cash among them after the robbery. *Id.* at 279 (Page ID #919).

Wagner and Baker then left in Baker's truck, and Elijah Messer followed them in his brother's truck, which was driven by Angela Mills,[2] who had been at Adam Messer's trailer while the three men discussed the robbery. *Id.* at 280–81, 284–85 (Page ID #920–21, 924–25). After arriving at Donald Mills's house, Baker busted through the front door. *Id.* at 287 (Page ID #927). Wagner corroborated the version of events given by Charlene James Mills and testified that he

---

[1]A "Roxicet 30" is an oxycodone pill. R. 141 (Trial Tr. at 10) (Page ID #981).

[2]Angela Mills was also known to some of the witnesses as Michelle Brown or Michelle Brown Mills. R. 141 (Trial Tr. at 208–09) (Page ID #1179–80); R. 144 (Trial Tr. at 102) (Page ID #1939). There is no indication that she is related to Donald Mills.

stayed with Mills's wife and children, while Baker tried to find out from Mills where the pills and money were. *Id.* at 291–93 (Page ID #931–33). Wagner heard several gunshots, walked toward the front door, and saw Baker come out of a room. *Id.* at 295 (Page ID #935). The two men left in Baker's truck, and Baker told Wagner that Mills "pulled a gun" and that "I had to shoot him." *Id.* at 298 (Page ID #938). Baker took approximately five oxycodone pills from Mills's house. R. 141 (Trial Tr. at 14) (Page ID #985).

Hensley also testified that Baker said he was planning to rob "a guy that had a bunch of money and some pills in a safe." *Id.* at 163 (Page ID #1134). Baker was in his truck with Wagner during this conversation with Hensley. *Id.* Baker's ex-wife testified that Baker told her that he had planned to rob Mills but that "Mills pulled a gun on him and [Baker] had to shoot [Mills] in self-defense." *Id.* at 178 (Page ID #1149). Elijah Messer testified that Baker and Wagner arrived at Adam Messer's trailer in the early hours of May 9. *Id.* at 210–12 (Page ID #1181–83). Elijah Messer corroborated that Baker showed him and Wagner an aerial shot of Mills's house and that the three of them discussed robbing Mills. *Id.* at 214–16 (Page ID #1185–87). Elijah Messer testified that the plan was that "[Baker] was going to give me some [pills]. And then I was going to buy some [pills], or trade some meth for some [pills]." *Id.* at 218 (Page ID #1189). Wagner and Baker would split the rest of the pills. *Id.* After the robbery, Baker told Elijah Messer that he shot Mills because Mills had a gun and tried to shoot him. *Id.* at 224–25 (Page ID #1195–96).

Adam Messer also testified that sometime at night on May 8 or early in the morning of May 9, he heard his brother, Baker, and Wagner discussing "Mills flashing money" and having "all of these pills." R. 144 (Trial Tr. at 112) (Page ID #1948). Adam Messer testified that his brother was a drug dealer and would get 100 to 200 oxycodone pills from Mills at a time, which

5

Elijah would sell "to support his habit." *Id.* at 113 (Page ID #1949). Adam Messer also saw the aerial photograph of Mills's house on Baker's iPad. *Id.* at 116–17 (Page ID #1952–53).

In July 2014, Baker was indicted in the Knox County Circuit Court on several state-law counts related to Mills's death. R. 149 (Mot. Dismiss/Limit Sentence at 1) (Page ID #2774). In November 2017, a Kentucky jury found Baker guilty of reckless homicide; robbery in the first degree; impersonating a peace officer; and tampering with physical evidence, and he was sentenced to a total of nineteen years' imprisonment. *Id.* Two years later, he received a pardon from then-Governor of Kentucky Matthew Bevin, who commuted his sentence to time served. R. 165 (Presentence Investigation Report ("PSR") ¶ 116) (Page ID #3005). Governor Bevin stated in the pardon that "the evidence supporting [Baker's] conviction is sketchy at best," and expressed that he was "not convinced that justice has been served in the death of Donald Mills," nor was he "convinced that the evidence has proven the involvement of Patrick Baker as murderer." *Id.*

In May 2021, a federal grand jury indicted Baker on one count of unlawfully causing Mills's death through the use of a firearm during and in relation to a drug trafficking offense, namely conspiracy to distribute oxycodone, in violation of 18 U.S.C. § 924(j)(1) and 21 U.S.C. § 846. R. 1 (Indictment) (Page ID #1). Following a nine-day trial, the jury found Baker guilty on that count. R. 120 (Verdict) (Page ID #548). Baker then moved to dismiss the indictment against him, or in the alternative, to limit his federal sentence to no more than nineteen years' imprisonment, the same length as his state-court sentence prior to the pardon and commutation. R. 149 (Mot. Dismiss/Limit Sentence at 1) (Page ID #2774). He also filed a *Brady* motion, seeking the production of impeachment material related to any deals for leniency or sentence modification struck with government witnesses Wagoner, Wagner, and Elijah Messer. R. 151 (*Brady* Mot. at

1) (Page ID #2781). The district court denied both motions. R. 159 (Mem. Op. & Order at 1) (Page ID #2933). The district court sentenced Baker to a term of 504 months' imprisonment, with a downward departure of 30 months to account for the time that Baker had already served in state custody, for a total of 474 months' imprisonment. R. 168 (Sent'g Hr'g Tr. at 93–94) (Page ID #3143–44). Baker now timely appeals. R. 163 (Notice of Appeal) (Page ID #2967).

## II. VINDICTIVE PROSECUTION

Baker argues that the federal government vindictively prosecuted him by pursuing federal-law charges against him only after he received a gubernatorial pardon for his state-law conviction based on the same underlying conduct. We have held that "the ultimate decision whether to dismiss an indictment for prosecutorial vindictiveness is reversible only if the district court abused its discretion." *United States v. LaDeau*, 734 F.3d 561, 565 (6th Cir. 2013). As we have explained:

> Because a district court has no discretion not to abide by governing law, an erroneous legal conclusion deserves no deference on appeal. As a result, even under abuse-of-discretion review, a district court commits error requiring reversal if its determination whether to dismiss an indictment for prosecutorial vindictiveness depends upon a misapplication of pertinent law. By contrast, where the district court's dismissal determination hinges upon factual findings, we defer to the district court's decision unless the findings upon which it was predicated are clearly erroneous.

*Id.* at 566 (internal citations omitted).

The Due Process Clause "prohibits the prosecution from punishing a defendant for exercising a protected statutory or constitutional right." *Id.* A defendant can demonstrate vindictive prosecution either through actual vindictiveness or by showing a "realistic likelihood of vindictiveness." *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001) (quoting *United States v. Andrews,* 633 F.2d 449, 453 (6th Cir. 1980)). To establish a "realistic likelihood of vindictiveness," a defendant must show "that (1) the prosecutor has 'some "stake"' in deterring

the [defendant's] exercise of his rights and (2) the prosecutor's conduct was somehow 'unreasonable.'" *Id.* at 482 (quoting *United States v. Anderson*, 923 F.2d 450, 453–54 (6th Cir. 1991)). "Once a court has found that a realistic likelihood of vindictiveness exists, the government bears the burden of disproving it or justifying the challenged state action." *Id.* But "[i]f the government fails to present evidence sufficient to rebut the presumption, the presumption stands and the court must find that the prosecutor acted vindictively." *Id.*

Baker therefore must demonstrate that federal prosecutors had some stake in deterring the exercise of his state-law right to seek a pardon, but his argument falters as a result of the separate-sovereigns (or dual-sovereignty) doctrine. Under the separate-sovereigns doctrine, the Fifth Amendment right against double jeopardy is not violated when a defendant is indicted and convicted in federal court after already having been convicted of an offense based on the same conduct in state court, or vice versa. *Abbate v. United States*, 359 U.S. 187, 195 (1959); *see also Gamble v. United States*, 139 S. Ct. 1960, 1964 (2019). Baker's claim is further complicated by the fact that federal prosecutors generally are afforded broad discretion in decisions involving charging. *See, e.g.*, *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

Accordingly, we have previously held that a defendant's due-process rights are not violated when state authorities refer the defendant's case to federal authorities for prosecution, "as long as [federal] prosecutors are not acting as rubber stamps and exert their own discretion as to whether or not to prosecute." *United States v. Allen*, 954 F.2d 1160, 1166 (6th Cir. 1992). Similarly, we

have also found no due-process violation where state authorities allegedly "triggered" the defendant's federal prosecution by placing a call to federal law enforcement regarding the defendant's guilty plea in state court. *United States v. Odom*, 42 F.3d 1389, 1994 WL 669675, at *2 & n.1 (6th Cir. Nov. 29, 1994) (table). Baker has not presented any facts that suggest that federal prosecutors simply acted as rubber stamps for the state instead of exercising their own discretion in charging him. Baker points to the fact that the U.S. Attorney for the Western District of Kentucky announced that his office would consider federally prosecuting individuals pardoned by Governor Bevin. Appellant Br. at 30–31. But Baker was prosecuted by the U.S. Attorney for the Eastern District of Kentucky. And even so, the fact that federal prosecutors might "consider" prosecution of such individuals does not suggest an abdication of federal discretion.

Our sibling circuits have likewise declined to find prosecutorial vindictiveness in cases involving separate sovereigns. *See, e.g.*, *United States v. Ng*, 699 F.2d 63, 68 (2d Cir. 1983) ("[T]he fact that the prosecutions of the defendants are by two different sovereigns, each acting independently under its own laws and in its own interest without any control of or by the other, renders inapplicable the concept of prosecutorial vindictiveness."); *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989) (per curiam) ("[T]he involvement of a separate sovereign tends to negate a vindictive prosecution claim."); *United States v. Johnson*, 91 F.3d 695, 698–99 (5th Cir. 1996) (concluding that there was no prosecutorial vindictiveness when the defendant was prosecuted federally following his acquittal in state court on a capital-murder charge and his successful filing of a grievance against two local assistant district attorneys for withholding exculpatory evidence); *United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990) (concluding that there was no prosecutorial vindictiveness when federal prosecutors indicted the defendant

after his state-court indictment was dismissed, in part because "[w]here there are successive prosecutions by two sovereigns, as in this case, it is improbable that a realistic likelihood of vindictiveness exists"); *United States v. Beede*, 974 F.2d 948, 952 (8th Cir. 1992) (concluding that "state and federal prosecutors must remain free to exercise their prosecutorial discretion with respect to the charging decision" regardless of the other sovereign's charging decision); *United States v. Turpin*, 920 F.2d 1377, 1388 (8th Cir. 1990) (holding that the defendant's due-process rights were not violated when his state-court case was dismissed and he was indicted in federal court based on the same conduct, even though he was subject to a harsher sentence in federal court); *United States v. Robison*, 644 F.2d 1270, 1273 (9th Cir. 1981) (holding that "the involvement of separate sovereigns tends to negate a vindictive prosecution claim," but declining to hold that "a second prosecution can never be vindictive when it follows a successful defense in a foreign jurisdiction").

As the Seventh Circuit concluded, "the possibility of institutional bias against retrial and a personal prosecutorial stake in the proceedings is minimized" when separate sovereigns initiate the two indictments. *Heidecke*, 900 F.2d at 1160. And the First Circuit has even suggested that "a finding of complicity between federal and state prosecutors" would be required to show vindictive prosecution where separate sovereigns are involved. *United States v. Stokes*, 124 F.3d 39, 45 n.4 (1st Cir. 1997). Baker has not made any showing of complicity between state and federal prosecutors that would make us depart from the holdings of our sibling circuits.

Baker's argument also falters on the unreasonableness prong, because new evidence was developed between his conviction in state court and his prosecution in federal court. Wagoner first talked with law enforcement in August 2021 about his version of the events at issue, and thus

10

his testimony was newly available at Baker's federal trial. R. 140 (Trial Tr. at 218) (Page ID #858). Wagner also provided additional, previously unavailable, details as part of his testimony at Baker's federal trial. R. 141 (Trial Tr. at 23–27) (Page ID #994–98). The new availability of this additional evidence thus provides a possible explanation, unrelated to Baker's pardon, for the federal prosecutors' decision to seek an indictment against Baker in 2021.

Although we are troubled by the timing of Baker's federal prosecution following his state-law pardon, and by the impression that Baker may not have received such a lengthy federal sentence but for his acceptance of a state-law pardon, we cannot say that the district court abused its discretion in finding that there was no reasonable likelihood of vindictiveness in these particular circumstances. Cases may arise in which the facts demonstrate that the federal government had a stake in defeating a defendant's exercise of their state-law rights, and thus under such circumstances, a defendant's due-process rights may be violated by a subsequent prosecution by a separate sovereign. In this case, however, Baker has not made such a showing.

## III. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

Baker next argues that that the government's evidence was insufficient to prove beyond a reasonable doubt that he unlawfully caused Mills's death through the use of a firearm during the commission of a drug trafficking conspiracy. We review de novo challenges to the sufficiency of evidence. *United States v. Ray*, 803 F.3d 244, 262 (6th Cir. 2015). If, however, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we must uphold the jury's verdict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

In analyzing sufficiency of the evidence issues, "we do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury.'" *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). A conviction can be sustained on circumstantial evidence alone, "and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)). Likewise, "the uncorroborated testimony of an accomplice may support a conviction under federal law." *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985). Baker has not surmounted the heavy burden to show that the evidence was insufficient to support his conviction.

## B. Conspiracy to Distribute Oxycodone

To obtain a conviction against Baker, the prosecution was required to prove that Baker caused Mills's death through use of a firearm "in the course of a violation of subsection (c)." 18 U.S.C. § 924(j). In relevant part, subsection (c) criminalizes using or carrying a firearm "during and in relation to any . . . drug trafficking crime." *Id.* § 924(c)(1)(A). Subsection (c) further defines "drug trafficking crime" as "any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46." *Id.* § 924(c)(2). The relevant drug-trafficking crime that formed an element of the charged offense was conspiracy to distribute oxycodone, in violation of 21 U.S.C. § 846. R. 1 (Indictment) (Page ID #1).

"To obtain a conspiracy conviction under 21 U.S.C. § 846, 'the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join and participated in the conspiracy.'" *United States v. Anderson*, 89 F.3d 1306, 1310 (6th

Cir. 1996) (quoting *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990)). Although there need not be a "formal, written agreement," the government must prove "an agreement beyond a reasonable doubt." *Id.* We have previously held that a buyer-seller relationship alone is generally insufficient to bring a buyer into the conspiracy, because "mere sales do not prove the existence of the agreement that must exist for there to be a conspiracy." *Id.* If, however, "there is additional evidence beyond the mere purchase or sale, from which knowledge of the conspiracy may be inferred," we will uphold a conspiracy conviction. *United States v. Grunsfeld*, 558 F.2d 1231, 1235 (6th Cir. 1977). Circumstantial evidence that can establish a conspiracy "includes advance planning, ongoing purchases or arrangements, large quantities of drugs, standardized transactions, an established method of payment, and trust between the buyer and seller." *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021).

Here, the government established evidence of a conspiracy beyond a mere buyer-seller relationship. Baker believed that Mills had 1,500 oxycodone pills and $200,000 in cash in his home. R. 140 (Trial Tr. at 257) (Page ID #897). Both Wagner and Elijah Messer testified that the plan after the robbery was for the three men to split the oxycodone pills among them. *Id.* at 279 (Page ID #919); R. 141 (Trial Tr. at 218) (Page ID #1189). Even split among three people, the large quantity of oxycodone pills that Baker believed they would recover from the robbery suggests the existence of a conspiracy beyond a mere buyer-seller relationship or the acquisition of drugs for personal use. Testimony from Wagoner, Wagner, Hensley, Elijah Messer, and Adam Messer demonstrated the substantial amount of advance planning that went into the robbery for the purpose of obtaining and subsequently distributing the oxycodone. R. 140 (Trial Tr. at 198–205, 270) (Page ID #838–45, 910); R. 141 (Trial Tr. at 163, 210–18) (Page ID #1134, 1181–89);

R. 144 (Trial Tr. at 112–17) (Page ID #1948–53). And Adam Messer's testimony established that the robbery and subsequent plan to split the oxycodone pills among Baker, Wagner, and Elijah Messer went far beyond Elijah Messer's regular buyer-seller relationship with Mills, where Elijah would purchase 100 to 200 oxycodone pills from Mills at a time, which Elijah would then sell to others. R. 144 (Trial Tr. at 113) (Page ID #1949). In sum, there was sufficient evidence from which a rational factfinder could conclude that Baker, Wagner, and Elijah Messer conspired to rob Mills of a large quantity of oxycodone for the purpose of distributing the oxycodone.

## C. Malice Aforethought

Baker next argues that the government did not present sufficient proof of malice aforethought at trial to sustain his conviction. To obtain a conviction under 18 U.S.C. § 924(j)(1), the government must prove beyond a reasonable doubt that the defendant committed murder, as defined by 18 U.S.C. § 1111. Section 1111 defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). "Malice aforethought may be inferred when the defendant 'grossly deviates from the standard of care to such an extent that a jury could conclude that he must have been aware of a serious risk of death or serious bodily injury.'" *United States v. Conatser*, 514 F.3d 508, 523 (6th Cir. 2008) (quoting *United States v. Sheffey*, 57 F.3d 1419, 1430 (6th Cir. 1995)).

Baker argues that, because his ex-wife, Elijah Messer, and Wagner all testified that Baker told them that he killed Mills after Mills pulled out a gun, there was insufficient evidence that Baker acted with malice aforethought in killing Mills. R. 140 (Trial Tr. at 298) (Page ID #938); R. 141 (Trial Tr. at 178, 224–25) (Page ID #1149, 1195–96). The jury, however, reasonably could have chosen to credit the testimony of Mills's wife that she did not hear a struggle or fight prior to

14

the gunshots, which cuts against Baker's self-defense theory. R. 140 (Trial Tr. at 108) (Page ID #748). And it is not proper for us to reweigh the evidence or consider the credibility of witnesses. *Hilliard*, 11 F.3d at 620. We have, moreover, previously held that the fact of aiming a gun in the victim's direction and firing it "alone supports a finding of specific intent," which is a more culpable mental state than malice aforethought. *United States v. Grant*, 15 F.4th 452, 458 (6th Cir. 2021); *see also United States v. Milton*, 27 F.3d 203, 208 (6th Cir. 1994) (holding that the defendant acted with malice aforethought by firing two shots into the victim's car). Baker does not contest that he aimed the gun at Mills and fired it. Thus there was sufficient evidence for a reasonable factfinder to conclude that Baker acted with malice aforethought when he shot Mills.

## IV. FALSE TESTIMONY AND *BRADY*

Baker argues that the district court erred in denying his motion for discovery and an evidentiary hearing on the issue of whether Wagoner received an agreement for a reduced sentence in exchange for his testimony against Baker, and, if so, whether Wagoner testified falsely regarding this issue. Although discovery motions are typically reviewed for abuse of discretion, we review de novo claims pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). *United States v. Miller*, 161 F.3d 977, 986–87 (6th Cir. 1998). "To establish a violation of *Brady*, the [defendant] has the burden of establishing that the prosecutor suppressed evidence; that such evidence was favorable to the defense; and that the suppressed evidence was material." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

Baker's motion was based on the fact that Wagoner, who was serving a federal sentence for unrelated drug offenses at the time he testified against Baker in federal court, *United States v. Wagoner*, 836 F. App'x 374, 376 (6th Cir. 2020), received a reduction in his federal sentence from

15

143 months' imprisonment to 86 months' imprisonment on November 1, 2021, just a few months after testifying against Baker. R. 151 (*Brady* Mot. at 2) (Page ID #2782). Baker points to no additional information to suggest that Wagoner had an agreement with the government *prior* to testifying at Baker's federal trial. As we have held:

> [A]lthough we do not take issue with the principle that the prosecution must disclose a tacit agreement between the prosecution and a witness, it is not the case that, if the government chooses to provide assistance to a witness following a trial, a court must necessarily infer a preexisting deal subject to disclosure under *Brady*.

*Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008) (en banc); *see also Williams v. Coyle*, 260 F.3d 684, 707 (6th Cir. 2001) ("The mere fact that [the witnesses'] sentences were later altered is not evidence that a deal existed prior to their testimony at trial."). Because Baker has provided nothing to suggest any agreement or understanding between the government and Wagoner prior to his testimony, the district court did not err in denying Baker's discovery motion pursuant to *Brady*.

## V.  CONCLUSION

For the foregoing reasons, we **AFFIRM** Baker's conviction.